## MELLOR *v.* COX.

*(District Court, D. South Carolina.* January 19, 1891.)

1. ASSAULT ON SEAMAN—LIABILITY OF MASTER.

The master of a vessel is not liable for personal injuries inflicted on a seaman by the mate before the master could interfere.

2. SAME.

On a libel by a seaman against the master for personal injuries, the master denied the allegations of cruel treatment, which were testified to by libelant and other seamen only. There was no evidence of cruel treatment either before or after one transaction mentioned, though the voyage was a long one. The master, libelant, and vessel were British. It appeared that libelant saw a British consul at the port where the alleged cruel treatment occurred, but made no complaint; that on arriving at this port he saw the consul, and complained of the mate only; that in a previous suit he claimed his discharge by reason of nonage, and said nothing of bad treatment. *Held*, that the libel would be dismissed.

In Admiralty. Libel *in personam* for personal injuries.

*C. B. Northrop*, for libelant.

*I. N. Nathans*, for respondent.

SIMONTON, J. Libelant was a cabin-boy, and afterwards acting cook, on the Topsey. He shipped at Quebec as cabin-boy, and was made cook on leaving Marseilles, on a voyage, via Cardinas and Matanzas, to Charleston. On reaching this port, he left the bark without leave, and, relying on his nonage, joined three other seamen of the same bark in a libel for wages. He now brings this libel for cruel and severe treatment while on the bark. The libel contains six articles, involving matters of complaint. The first of these (fourth in the libel) charges that during the time libelant was on board the bark the master habitually beat libelant, brutally and unmercifully, without cause or provocation. The last of these (ninth in libel) alleges that on many occasions throughout the time he served on the bark libelant was beaten, kicked, and struck with a rope's end by the master, without cause or provocation on his part. The other articles are of matters which occurred in the port of Matanzas; such as throwing hot water on libelant on 16th July, 1890, notwithstanding that the master knew he was unwell; beating him with fists, and kicking him with heavy boots twice in one day, when he was ill in his bunk; by wakening him the next morning, jamming his head against the wooden corner of his bunk, dragging him therefrom, and chasing him at a rope's end all round the deck; not only permitting, but encouraging, the mate to pour a pot of scalding coffee on libelant, and then run him around the deck, flaying his scalded flesh. The answer denies these charges *in toto*. The libelant produces as his witnesses, besides himself, the three seamen who joined him in the libel for wages, which has recently been heard. No other persons but these and the master have testified. The cause was delayed, expecting the return of the Topsey and her crew to Savannah. Her loss at sea prevents this, and the case has gone on without further testimony.

With regard to the general charges noted above, of habitual brutal and unmerciful treatment, even in its softened and modified form of beating, kicking, and striking with a rope's end on many occasions, I see no evidence in the record. Libelant himself says on this point:

"*Question.* How long were you on that vessel? *Answer.* 11 months. *Q.* Did you have a nice time on board? *A.* No, not very. *Q.* State your experience. *A.* The captain beat me occasionally, and ill-treated me generally. *Q.* Can you tell any circumstances in which you were badly treated? *A.* Yes; was scalded twice."

—And so on, relating nothing but the Matanzas transactions. One of his witnesses (Healy) says that he was being "beaten eternally;" but in this Kelly contradicts him. He says: "On the voyage to Cuba I never saw him lick him only in the port of Matanzas;" and Montiero adds nothing which supports Healy in the extravagance of his statements. With regard to the complaint of treatment in Matanzas, there are three charges: *First.* That the master permitted the mate to throw a pot of

scalding coffee on libelant, and not only approved the act, but beat and whipped the libelant after he was scalded. He and the three witnesses speak of this occasion. Healy says that the captain, sitting in his chair aft, saw the mate throw the hot coffee over libelant, and chase him round the deck and beat him; that the master did not try to stop the mate until it was over, and he commenced to beat the boy again, and call him vulgar names. Montiero says that the captain was there, but the mate threw the coffee on him and kicked him before the captain could come up. When the captain did come up, he beat the boy, and he and the mate beat him with a rope, and run him round the deck. Describing the same transaction, libelant says that he was scalded on 5th July, in Matanzas, with coffee. "The mate did that." The master was three yards off. Saw the mate throw the hot coffee. "Seemed pleased. Went inside the cabin, and talked to the mate, and never offered any remedy. Then he came round to the starboard side, and said I was a scoundrel, and then went off." Kelly in his account says that the captain was on the port side, and could see the whole thing, (the scalding by the mate,) and—

"The captain came to me, and wanted the boy to go in the galley. He couldn't come. He said: 'You get some oil, and rub over the scalds on the boy's arm;' but the boy couldn't bear me to touch him, and the ships in the harbor could hear him scream. I got some lint and soaked it in oil, and put it on his head and arm where they were scalded. The arm was worst of all."

When the Topsey reached this port, Kelly, who is his next friend in this case, went with the boy before the British consul, and made complaint of this very transaction against the mate. He made no charge against the captain. It is very clear that the act of the mate was done before the master could interfere, and, when he did interfere, it was to relieve and assist the boy. He cannot be held responsible for the mate's act.

The *second* complaint is that the master threw a bucket of hot water over him in Matanzas. Kelly says that libelant brought a bucket of water in the pantry half full, and the captain said: "You have not water enough to wash up," and he took the bucket, and threw the water over him. Libelant says, in reply to a question, "Was the water boiling hot?" "No, but very hot. He threw it over my neck and face."

The other matters of complaint are kicking him in his berth and beating him with his hand. The master denies all this *in toto.*

It is no easy matter to decide complaints of this kind between a master and one of his crew. The master is responsible for the safety of his ship, and for the life and health of all on board. He is at the head of a small and isolated society, composed of a rough element, requiring a strong hand. His authority must be maintained, and discipline of the most strict kind observed. "In case of disobedience or disorderly conduct [on the part of any of the crew] he may lawfully correct them in a reasonable manner; the English law likening his authority in this respect to that of a parent over his child, or of a master over his apprentice or scholar." Macl. Shipp. 204. In every case courts of justice

have the right of judging of the occasion and the manner of the use of this despotic authority. The difficulty in coming to a decision upon such a question is greatly enhanced by the seeming impossibility of arriving at a true statement of the facts attending it. From the nature of their occupation, seamen acquire a strong feeling of comradeship. They are partisan to a degree, and their testimony is always controlled by the feeling that they must stand by each other. The despotic power possessed by the master intensifies this when they come to testify on shore respecting a difference between him and one of their number, and the boundary line of truth and falsehood cannot be distinguished. We must look to extraneous circumstances in nearly every instance, and must try the testimony by remote facts. In the present case the bark had sailed from Quebec to Marseilles, from Marseilles to Cardinas, then to Matanzas, and thence to Charleston. There is no evidence of bad treatment between Quebec and Marseilles. The great preponderance of evidence is that there was no bad or cruel treatment between Marseilles and Cardinas and Matanzas. There is no evidence of bad treatment between Matanzas and Charleston. So if the witnesses for libelant are to be believed, the master suddenly became seized with malice towards libelant at Matanzas, and as suddenly lost it. While at Matanzas they were within reach of, and libelant actually saw, a British consul more than once. He made no complaint to him whatever of inhuman treatment, nor sought his aid in any way. When the bark reached this port, libelant, with Kelly, his friend, saw the consul, complained only of the mate, made no complaint of the master, and, although he was desirous of quitting the ship, did not seek his discharge through the consul, but preferred to quit without leave. This seemed to have been a decision arrived at after he reached this port, for when he came here he got the master to get him a suit of clothes. In his suit for wages he does not explain his departure from the bark by reason of bad treatment. He claims his discharge by reason of his nonage. Taking these into consideration, with the fact that we are trying a case between British subjects on a British vessel, involving, in good measure, the discipline on these foreign ships, I am not disposed to favor the libelant. If the facts proved presented a case of gross cruelty, it would be otherwise; but, if every time a master punishes a seaman he will be called before the courts of the first port he enters to explain, excuse, or justify his act, in a short time the authority with which the law maritime clothes him would be vain, and the discipline of ships would be ruined.

Let an order be passed dismissing the libel, with costs.