BOARD OF COM'RS OF ONSLOW COUNTY et al. v. TOLLMAN.

(Circuit Court of Appeals, Fourth Circuit.   May 1, 1906.)

No. 646.

1. COURTS—FEDERAL COURTS—JURISDICTION—COMITY.

Where a suit was brought by county commissioners against a county treasurer alone in a state court, in which the only relief desired was an injunction to restrain the payment of certain coupons taken from county railroad aid bonds, and there was no attempt in such suit to have the court take possession of the funds applicable to pay such coupons, the mere pendency thereof was no ground for the refusal of the federal courts to take jurisdiction of a suit brought by the holder of certain of such coupons to enforce payment thereof, and to enforce an alleged trust of funds applicable thereto.

2. INJUNCTION—VIOLATION—CONTEMPT.

Where a temporary injunction was issued by a state court in a suit by county commissioners against the county treasurer to restrain the payment of certain county railroad aid bonds, compliance by the county treasurer with the lawful order of a federal court having jurisdiction of the parties, directing payment of such coupons in a suit by the holders thereon, would not constitute a contempt of the state court.

3. SAME—MODIFICATION OF ORDER.

Where, pending an injunction issued by a state court restraining a county treasurer from paying coupons detached from county railroad aid bonds, a valid order requiring such payment was issued by a federal court in another suit, the remedy of the treasurer was not by a stay of proceedings in the federal court, but by an application to the state court to so modify its order as not to restrain the treasurer from obeying the federal court order.

4. COURTS—FEDERAL COURTS—RULES OF DECISION—STATE CONSTITUTION—CONSTRUCTION.

Where at the time certain railroad bonds in question were issued by a county under statutory authority there was no opinion of the Supreme Court of the state construing a section of the state Constitution which it was subsequently claimed was violated by the statute under which the bonds were issued, the holder of coupons detached from such bonds thereon in a suit in a federal court was entitled to have such court put its own construction on such constitutional provision, unaffected by opinions of the state Supreme Court rendered after the issuance of the bonds.

[Ed. Note.—State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

5. SAME.

Where a railroad company to which county aid bonds were issued acquired the same before any decision of the state court, construing a constitutional provision, alleged to have been violated by the statute under which the bonds were issued, and was therefore entitled as a bona fide purchaser of the bonds to have a federal court, in an action on coupons taken therefrom put its own construction on such constitutional provision, independent of subsequent opinions rendered by the Supreme Court of the state, the railroad's assignees of the bonds and coupons were entitled to the same rights, though they may have purchased after the rendition of such state decisions.

6. STATUTES—PASSAGE—AYES AND NAYS—ENTRY ON JOURNAL—CONSTITUTION—CONSTRUCTION.

Const. N. C. art. 2, § 14, provides that no law shall be passed to impose any tax, or to allow counties to do so, unless the bill for the purpose shall have been read three several times on three different days, and unless the

145 F.—48

ayes and nays on the second and third reading of the bill shall have been entered on the journal. *Held* that, where the House Journal showed that Laws N. C. 1885, p. 439, c. 233, incorporating a railroad, and authorizing the issuance of county aid bonds, was passed by the following vote: "Ayes 94, nays ... ; total ..."—such record sufficiently showed that there was no negative vote cast, under the presumption that the clerk of the House charged with the recording of the vote performed his duty, and hence such record constituted a sufficient compliance with the Constitution.

7. SAME—NAMES OF MEMBERS.

Where the House Journal showing the passage of a bill in recording the representatives voting for the same added the respective counties from which representatives came wherever there were two representatives of the same surname, the record was not defective for failure to give the Christian names of the members.

8. SAME—NECESSITY OF ROLL-CALL VOTE.

Acts N. C. 1887, p. 706, c. 404, supplementing and amending an act to amend the charter of the Wilmington, Onslow & East Carolina Railroad Company, was not a law passed for the imposition of a tax, or to allow a tax to be imposed by counties, within Const. art 2, § 14, and was not therefore required by such section to be passed by a roll-call vote.

9. COUNTIES—RAILROAD AID BONDS—ISSUANCE.

Act N. C. 1885, p. 445, c. 233, § 14, providing for the issuance of certain county bonds in aid of a railroad by a board of trustees, did not require that the bonds should be executed by such trustees.

10. SAME—EXECUTION BY COUNTY COMMISSIONERS.

Act N. C. 1885, p. 439, c. 233, authorizing the issuance of certain railroad aid bonds by a county, being silent on the subject of the execution of the bonds, such bonds were properly executed by the county's board of commissioners.

11. SAME—EXECUTION—STATUTES.

Code, N. C., § 702, declares that every county shall be a body corporate and politic. Section 703 declares that the powers of the county shall be exercised by the board of commissioners, or in pursuance of a resolution adopted by them. Section 704 authorizes the county to make contracts, and section 712 declares that the clerk of the board shall record all its proceedings, and enter every resolution or decision concerning the payment of money, and record the vote of each commissioner on any question submitted to the board, if required by any member present. *Held* that, where the records of a board of county commissioners did not show a formal resolution directing the execution of certain railroad aid bonds, but such bonds were shown to have been executed at a meeting of the board convened for that purpose, and that all five members of the board were present during at least a part of the time required for the signing of the bonds, and a majority of them were present during all of such time during which the board was in session, the bonds were properly executed by the board.

12. EVIDENCE—BEST AND SECONDARY—COUNTIES—BONDS—EXECUTION.

In an action on county bonds, parol evidence is admissible to establish the facts concerning their execution.

13. COUNTIES—RAILROAD AID BONDS—DELIVERY—STATUTES.

The provision of Act N. C. 1885, p. 439, c. 233, § 14, requiring delivery of certain county railroad aid bonds authorized by such acts to be delivered by the board of trustees provided for, was directory merely, and hence a delivery of the bonds by the county's board of commissioners did not invalidate them.

14. SAME—INTEREST PAYMENTS—TIME—WAIVER.

A railroad company entitled to railroad aid bonds issued under Laws N. C. 1885, p. 439, c. 233, was entitled to waive the provision of such act

authorizing semiannual interest payments, and hence the fact that the bonds provided for annual interest payments was immaterial.

15. SAME—POWERS—COMPROMISE OF SUIT.

Under Code N. C., § 704, providing that counties shall have power to sue and be sued in the name of their boards of commissioners, to make such contracts and to purchase and hold such personal property as may be necessary for the exercise of their powers, and to make such orders for the disposition or use of their property as the interest of their inhabitants require, a county, on being sued by a railroad company to compel the delivery of county railroad aid bonds, had power to compromise such litigation by surrendering its right to the railroad company's stock, which was of little or no value, in consideration of the railroad company's surrender of its right to receive a substantial portion of the bonds which the county had bound itself to deliver.

16. SAME—SPECIAL TAXATION—TRUSTS.

Where taxes were levied and collected to pay coupons on railroad aid bonds issued by a county, the fund so collected was impressed with a trust in the hands of the county treasurer for the benefit of the owners of the coupons.

17. EQUITY—ADEQUATE REMEDY AT LAW.

Where a county, having issued certain railroad aid bonds, claimed that the bonds were void, and instituted proceedings in a state court to restrain the county treasurer from paying money collected from taxes levied for the payment of coupons on the bonds, the remedy of the holder of such coupons at law was inadequate, and he was therefore entitled to maintain a suit in equity to compel the application of the taxes so collected to the payment of the coupons.

18. APPEAL—ERRORS REVIEWABLE—MODIFICATION OF DECREE.

Where, on appeal from a decree directing application of certain county taxes to the payment of coupons detached from county railroad aid bonds, the fact that the decree erroneously directed the entire tax to be applied to the payment of complainant's coupons was not assigned as error, and appellant's counsel stated in argument that the only question desired to be raised on appeal was the validity or invalidity of the bonds, the Circuit Court of Appeals would not notice such error, although it was authorized to do so by Court of Appeals Rule No. 11 (90 Fed. cxlvi, 31 C. C. A. cxlvi).

Appeal from the Circuit Court of the United States for the Eastern District of North Carolina, at Wilmington.

For opinion below, see 140 Fed. 89.

E. K. Bryan (Duffy & Koonce and W. D. McIver, on the brief), for appellant.

George Rountree (J. O. Carr, on the brief), for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and McDOWELL, District Judge.

McDOWELL, District Judge. This was a suit in equity, appellee being the complainant below. In 1885 the Legislature of North Carolina passed an act (chapter 233, p. 439, Laws 1885) incorporating the Wilmington, Onslow & East Carolina Railroad Company. So much of that act as is here of importance reads as follows:

"Sec. 13. That any county, township, city or town along or near the line of said railroad, or at any terminal point thereof, or at or near the line of its extension, its branches, lateral or connecting roads, or at their terminal points,

may subscribe to the capital stock of the said company, and to this end it shall
be the duty of the county commissioners and the proper authorities of such
city or town, upon the written application of any three commissioners appoint-
ed in accordance with section four (previous to organization of said company)
or the board of directors of the said Wilmington, Onslow and East Carolina
Railroad, said application stating the amount which it is desired that said
township, county, city or town shall subscribe to the capital stock of said
company, together with a petition of at least one-fifth of the qualified voters
therein, to appoint a day in which an election shall be held in such county,
township, city or town in the manner prescribed by law for holding other
elections, at which said election the legally qualified voters shall be entitled
to vote for or against such subscription, those favoring such subscription on
ballots written or printed 'Subscription,' and those opposing on ballots written
or printed 'No Subscription'; such election shall be held after thirty days' no-
tice, specifying the amount of subscription to be voted for, and to what com-
pany it is proposed to subscribe, posted at the court-house door and three
other public places in said county, township, city or town, at the usual voting
places, and by persons appointed in the manner that persons are appointed for
holding other elections in said county, township, city or town, and the returns
thereof shall be made and the results declared and certified as prescribed by
law in such other elections; and such results so certified shall be filed with the
register of deeds in said county, city or town, and shall be taken as evidence of
the same in any court in this state.

"Sec. 14. That if the result of said election shall show that the majority of
the qualified voters of said county, township, city or town favor subscription
to the capital stock of said railroad to the amount voted for in such election,
then said county commissioners, or the proper authorities of said city or town,
shall immediately make such subscription to the capital stock of said railroad,
payable in cash or the bonds authorized to be issued under this act, as may
be agreed upon, and appoint a board of trustees, consisting of not less than
three resident tax-payers of the county, township, city or town so voting, who
shall issue the bonds of said county, township, city or town to the amount so
voted for at said election, in such forms and denominations and running for
such length of time as may be determined on by said county commissioners or
proper authorities of such town or city, bearing interest at the rate of six per
cent. per annum, and said interest to be payable semiannually and evidenced
by coupons on said bonds, and said trustees shall deliver said bonds so issued,
or pay in cash as may be agreed, to said Wilmington, Onslow and East Carolina
Railroad Company upon receiving therefor for the use and benefit of said
county, township, city or town, proper certificates of stock in said Wilmington,
Onslow and East Carolina Railroad Company to the amount of subscription
so voted as aforesaid: Provided, however, that the said trustees shall deliver
to the said Wilmington, Onslow and East Carolina Railroad Company one-
fifth of the amount subscribed in bonds or cash as agreed at as early date after
said election as it is practicable to have the bonds prepared, balance by instal-
ments of one-fifth, as the work progresses within the county or township mak-
ing such subscription or in such as the cities or towns making subscriptions
may be located, until the grading is done and cross-ties procured for the track
in said counties respectively, when amount remaining shall be paid to said
Wilmington, Onslow and East Carolina Railroad Company to complete the
track, commencing at Wilmington and placing thereon one freight and pas-
senger train combined."

Section 15 provides for the levy of taxes to meet the interest on the
bonds above mentioned and for payment of the principal.

The act of 1885 was amended (chapters 89, 404, pp. 172, 706, Laws
1887), but it is unnecessary to set out these amendments.

Under the authority of the above-mentioned statutes, on the peti-
tion of the railroad company, the board of commissioners of Onslow

county, N. C., submitted to vote the question of subscribing to $60,-000 of the capital stock of the said company. An election was held on January 21, 1888, and the vote was declared and certified to be in favor of the subscription. The company, having constructed a part of its road, tendered to the commissioners half of the stock, and demanded the issue of $30,000 of the county bonds. This demand was refused, and the company brought suit against the board of commissioners. This action was removed to another county, and resulted adversely to the company. On appeal (Railroad v. Com'rs, 116 N. C. 563, 21 S. E. 205) the trial court was reversed. In the meantime the road had been completed, and the name of the company had been changed to Wilmington, New Bern & Norfolk Railway Company, and under this name another action was commenced against the board of commissioners, in which name a county is sued (Code, § 704) to compel the delivery of the remaining $30,000 of bonds. After the result of the appeal in the first action was known, the two actions were settled by compromise. The terms of the compromise agreement will be hereinafter set out. It is sufficient to say here that the agreement was, in effect, that the county should surrender any right to the stock, which was regarded as valueless, and should issue only $40,000 of bonds. Thereupon the two actions were dismissed, the orders of dismissal setting out briefly the nature of the compromise. The bonds—20 for $1,000 each and 40 for $500 each—were executed and delivered to the railway company on March 3, 1896. The bonds provided for interest payable annually on the 1st day of January at 6 per cent., and were in form the ordinary 10–40 year coupon bonds. The recital on the face of the bonds of the authority for their issue will be set out later on.

The bill alleges that the complainant and others purchased the said bonds for value in open market, without any notice of irregularity or illegality; that complainant is the owner of the coupons due on January 1, 1904, from 30 of the $500 bonds and from 19 of the $1,000 bonds, having a face value of $2,040, and that he has duly demanded payment thereof from the treasurer of Onslow county, and that payment has been refused. The bill not only urges the validity of the bonds and coupons under the act of 1885, but asserts that, even if this act be insufficient, authority for the issue of the bonds existed under certain sections of the Code of 1883.

It is further alleged that the reason for the treasurer's refusal is that the commisioners of Onslow county, in an action brought by them against the said treasurer, have secured a temporary injunction from the superior court of that county, restraining him from paying said coupons. It appears from the record before us that this action, which was instituted before complainant's bill was filed, is still pending; that the only decree so far rendered is the one above described; and that the ground for the restraining order is the alleged invalidity of the bonds. The defendants in the suit at bar are the board of commissioners of Onslow County, and E. W. Summersill, the treasurer of said county.

It should also be stated that the bill alleges that the interest coupons falling due prior to those in suit have been regularly paid, and that a tax sufficient to pay said last-mentioned coupons had been levied and collected, and that the fund thus derived is in the hands of the treasurer. The bill alleges a trust in behalf of complainant and the other holders of the coupons; that if not restrained the treasurer will make way with or dispose of the fund in his hands, and prays, inter alia, for a restraining order, and that a receiver be appointed to take and hold the fund pending final decree.

The answer of the defendants need not be set out in detail. It controverts the validity of the bonds on several grounds, which will be hereinafter stated and considered.

The first decree of the court below declares the bonds and coupons valid. The last decree, dated November 11, 1905, reads as follows:

"It appearing to the court, by the petition of the complainant herewith filed, that the defendants refuse to pay the coupons in suit in the main action, and which have heretofore been adjudged to be valid obligations of the county of Onslow, it is ordered that J. O. Carr, Esq., of Wilmington, N. C., be appointed receiver in this behalf, and that the defendants place in his hands and under his control the moneys in the treasury of Onslow county, proceeds of the tax levied for the purpose of paying the coupons on the bonds issued in subscription to the capital stock of the Wilmington, New Bern & Norfolk Railroad, and due on January 1, 1904, together with a sufficient sum, with interest thereon, and that he hold the same subject to the further order of this court. It is also ordered that the said receiver enter into bond, with surety to be approved by the judge of this court, in the penal sum of five thousand dollars, with the conditions for the faithful performance of his trust as such receiver. The defendants allowed to appeal without giving supersedeas bond."

The numerous assignments of error need not be considered in the exact order of assignment.

The first question that should engage our attention arises from the contention that the trial court, on principles of comity, should have declined jurisdiction of this suit because of the pendency in the superior court of Onslow county of the action brought by the board of commissioners against the treasurer of that county. We are unable to find that there was any error here. The action referred to is a suit in equity, founded on what is in essence a pure bill for injunction, to which the board and the treasurer are the only parties. A temporary injunction, restraining the treasurer from paying the coupons here in suit, had been granted prior to the institution of the suit below. So far as we can learn from the record of the action in the superior court, the only possible further relief that can be properly granted in that action is to perpetuate the temporary restraining order. It cannot, of course, be contended that the appellee here would in anywise be bound by any decree rendered in an action to which he is not a party. Hence we can perceive no reason why the court below should have refused to proceed. The mere priority of institution of the action in the superior court does not in the least require that the court below should have refused complainant the relief to which he is entitled. The rule governing the relations of

courts of co-ordinate jurisdiction where there is a conflict of jurisdiction, is clearly and fully stated in Farmers' Loan Co. v. Railroad Co., 177 U. S. 51, 61, 20 Sup. Ct. 564, 568, 44 L. Ed. 667:

"The possession of the res vests the court which has first acquired jurisdiction with the power to hear and determine all controversies relating thereto, and for the time being disables other courts of co-ordinate jurisdiction from exercising a like power. This rule is essential to the orderly administration of justice, and to prevent unseemly conflicts between courts whose jurisdiction embraces the same subjects and persons. Nor is this rule restricted in its application to cases where property has been actually seized under judicial process before a second suit is instituted in another court, but it often applies as well where suits are brought to enforce liens against specific property, to marshal assets, administer trusts, or liquidate insolvent estates, and in suits of a similar nature where in the progress of the litigation the court may be compelled to assume the possession and control of the property to be affected. The rule has been declared to be of especial importance in its application to federal and state courts."

But in the action in the superior court that court has not taken possession of the fund, and the action is not in any sense one to enforce a lien, to marshal assets, to administer a trust, to liquidate an insolvent estate, or of a nature at all similar to any such action. We give the members of the board credit for good faith, and therefore we regard the action that they have brought against the treasurer as one intended merely to prevent the treasurer from paying the coupons now in suit until the holder has in some court of competent jurisdiction, having the proper parties before it, decided that the coupons are valid obligations. The members of the board doubtless reasoned that the treasurer had no such interest in the question as to lead him to risk a judgment for costs against himself by refusing to pay the coupons; and, as it was impracticable otherwise to secure an adjudication of the question as to the validity of the coupons, they took the only practicable course open to them to make it incumbent on the coupon holders to sue for payment, and thus enable themselves to contest the validity of the coupons. The suggestion that the treasurer will be in contempt of the superior court should he, in obedience to the order of the court below, pay the fund in his hands to the receiver, seems to us without foundation. If such suggestion be sound, the appellee is as much bound by the decree rendered by the superior court as he would be if he had been made a party to that suit. The injunction of the superior court necessarily means no more than that the treasurer must not voluntarily pay the coupons. It does not mean that he shall not obey the lawful order of another court having jurisdiction of the parties. If the treasurer should, the decree below being affirmed, refuse to deliver the fund in his hands to the receiver, he will be in contempt of the court below; but obedience to such decree cannot be properly regarded as a contempt of the Superior Court. If, however, there be any possible doubt on this point, the remedy of the treasurer is not a stay of proceedings in the court below, but an application to the superior court to so modify its order as not to restrain the treasurer from obeying

the lawful order of a court of co-ordinate jurisdiction and equal rank. And this relief we doubt not will be there readily granted.

We shall next consider the contention that the statutes under which the bonds in question were issued were not enacted in accordance with the requirements of the Constitution of North Carolina.

·We have not thought it necessary, in view of the conclusion we have reached, to consider the contention of counsel for appellee that chapter 89, p. 172, Acts 1887, amending the act of 1885, did not require a roll-call vote. We shall assume the contrary. The validity of the act of 1885 and of the amendment, above mentioned is assailed on the ground that article 2, section 14, of the Constitution of North Carolina was not complied with, in that the yeas and nays were not duly entered. The language of article 2, section 14, of the Constitution is, so far as is now material, as follows:

"No law shall be passed * * * to impose any tax * * * , or to allow the counties * * * to do so, unless the bill for the purpose shall have been read three several times * * * which readings shall have been on three different days; * * * and unless the yeas and nays on the second and third reading of the bill shall have been entered on the journal."

The facts as to the journal entries are set forth in the record in three different methods: By certificates made by the Secretary of State; by examined extracts from the printed and published volumes of the journals; and by examined copies of the original journals. The entries as to the vote on the second and third readings of the act of 1885 in the House need not be here set out, as they, if differing in any essential respect, more nearly comply with the interpretation of the Constitution contended for by counsel for appellant than do any of the entries on the Senate Journal, or the entries on the House Journal concerning chapter 89, p. 172, of the Acts of 1887. The ground for appellants' contention is as fully shown as need be by the following copy of the entry made in the Senate Journal of the vote on the second reading of the act of 1885, and the copies of the entry made in the House Journal on the second reading of chapter 89, p. 172, of the Acts of 1887, and the transcript thereof in the House Journal as published:

"Senate Journal, Feby. 26, 1885.

"H. B. No. 461. S. B. No. 727. Bill to incorporate the Wilmington, Onslow and East Carolina Railroad Company, passed its second reading. Ayes, 34. Noes, ...; as follows:

"Those voting in the affirmative were: Messrs. Alexander, Bason, Bond, Brown, Buxton, Chadbourne, Connor, Cooper, Cowan, Dotson, Franklin, Graham, Gudger, Hackett, Hill, Holeman, Horne, Johnston, Kennedy, Lewis, Mason, Means, Parker, Poole, Rountree, Scott, Simmons, Tate, Thomas, Thompson, Todd, Troy, Twitty, Williams—34."

"House Journal, Feby. 11, 1887.

"House of Representatives.

"February 11th, 1887.

"A message is received from the Senate transmitting the following bills and resolutions, which are referred as follows:

"II. B. 744, substitute for S. B. 295. A bill to be entitled 'An act to amend an act to incorporate the Wilmington, Onslow and East Carolina Railroad Company,' being chapter 233, p. 439, of the Laws of 1885. Placed on the calendar.

"House of Representatives.

"February 18th, 1887.

"Calendar.

"II. B. 744. S. B. 295. A bill to incorporate the Wilmington, Onslow and East Carolina Railroad Company, is put on its second reading, and passes by the following vote:

"II. B. —, 744 —

"S. B. —, 295 —

"Messrs. Speaker,
Abell,
Allman,
——Ashcraft,
——Beeson,
Bell,
——Bennett,
——Bingham,
Blevins,
——Blount,
——Brogdon,
——Chandler,
——Chappell,
——Cheek,
——Cherry,
Chillcut,
——Coffey,
——Copeland,
Crawford, of Haywood,
Crawford, of McDowell,
Crenshaw,
——Crisp,
Croom,
——Doughton,
——Davis,
Deaver,
——Dorsett,
——Ellis,
Evans,
——Ewart,
Farmer,
Franklin,
Felton,
Fries,
Gatling,
Gray,
——Green,
Halstead,
——Hampton,
Harrington,
——Hayes,
Hinton,
——Holloway,
——Holman,
Holt,
Hoover,
Howe,
Hull,

——Jordan,
Kell,
——King,
Lane,
Leazar,
——Lindsey,
——Long,
——Lyon,
Macon,
Mangum,
——Manning,
——Martin,
Mills,
Moore,
——Morgan,
——McClure,
——McKinnon,
——McMillan,
——Newsom,
——Oakley,
Osborne,
——Overman,
——Parham,
Parson,
——Paschall,
Patton,
Pearson,
——Person,
——Pinnix,
Pitman,
Pritchard,
——Pritchett,
Proctor,
——Rawls,
——Redding,
——Regan,
——Sanders,
——Sharp,
——Shaw,
——Schenck,
Snell,
——Snipes,
——Sorrell,
—— Southerland,
——Speller,
Stancill,
——Stevens,

Stewart,
——Sutton,
——Surratt,
——Swain,
——Temple,
——Thomas,
Tilley,
Turner,
——Ward,
Watson, of Hyde,
Watson, of Vance,
Waters,
——Watts,
Webster, of Caswell,
Wells,
——White, of Halifax,
——White, of Perquimans,
Williams,
——Williamson,
Wilson,
——Wimberly,
——Woody,
——Worth,
——York,

Ayes ...... 69 ......
Nays..........Total.........."

The copy of the record as published concerning the vote set out in the extract just above reads as follows:

"House of Representatives.

"Friday, February 18, 1887.

"Bills are taken from the calendar and disposed of as follows:

"H. B. 744. S. B. 295. A bill to [amend, etc., omitted] incorporate the Wilmington, Onslow and East Carolina Railroad Company, is put on its second reading and passes by the following vote: Those voting in the affirmative are:

"Messrs. Ashcraft, Beeson, Bennett, Bingham, Blount, Brogdon, Chandler, Chappell, Cheek, Cherry, Coffey, Copeland, Crisp, Doughton, Davis, Dorsett, Ellis, Ewart, Green, Hampton, Hayes, Holloway, Holman, Jordan, King, Lindsey, Long, Lyon, Manning, Martin, Meares, Morgan, McClure, McKinnon, McMillan, Newsom, Oakley, Overman, Parham, Paschall, Person, Pinnix, Pritchett, Rawls, Redding, Regan, Sanders, Sharp, Shaw, Schenck, Snipes, Sorrell, Southerland, Spellar, Stevens, Sutton, Surratt, Swain, Temple, Thomas, Ward, Watts, White of Halifax, White of Perquimans, Williamson, Wimberly, Woody, Worth, and York—69."

The bonds here in question were delivered to the railroad company in 1896. Just when the appellee purchased the bonds held by him is not shown. It was later than June 19, 1900, but how much later does not appear. We have found no opinion of the Supreme Court of North Carolina bearing upon the construction of the Constitution in regard to the method of recording roll-call votes earlier than Smathers v. Com'rs, 125 N. C. 480 (1899) 34 S. E. 554, and Debnam v Chitty, 131 N. C. 657 (1902), 43 S. E. 3; in other words, at the time the bonds were issued to the railroad company, the Constitution had not been construed in respect to the question now under consideration. We are therefore of opinion that appellee has a right to insist that we put our own construction on the constitutional provision, and that, if we are of opinion that the acts in question were validly enacted, his rights cannot be affected by the two opinions above mentioned. That appellee may have become a purchaser after the publication of the opinion in the Smathers Case or even after that in Debnam v. Chitty, seems to us to be of no moment. The railroad company was a bona fide purchaser for value, and there had then been no decision which so much as suggested the possibility that the Supreme Court of North Carolina would construe article 2, § 14, as it has since done. Consequently, if the railroad company were now the holder of the bonds, and if it were the appellee here, it would have a right to insist that this court put its own construction on the constitutional provision. If so, its suc-

cessor in interest, even if such successor bought with full knowledge of both the above-mentioned opinions, has this same right. Such conclusion is necessary in order to give to the predecessor the full value of its right. See Com'rs v. Bolles, 94 U. S. 104, 109, 24 L. Ed. 46; Com'rs v. Clark, 94 U. S. 278, 286, 24 L. Ed. 59; Cromwell v. County, 96 U. S. 51, 59, 24 L. Ed. 681; New Buffalo v. Iron Co., 105 U. S. 73, 75, 26 L. Ed. 1024. That we should in this case put our own construction on the constitutional provision in question is settled by a long line of decisions by the Supreme Court of the United States, only a few of which need now be mentioned.

In Burgess v. Seligman, 107 U. S. 20, 33, 2 Sup. Ct. 10, 27 L. Ed. 359, it is said:

"So when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued."

See, also, Carroll County v. Smith, 111 U. S. 556, 562, 4 Sup. Ct. 539, 28 L. Ed. 517; Bolles v. Brimfield, 120 U. S. 759, 763, 7 Sup. Ct. 736, 30 L. Ed. 786; Folsom v. Ninety-Six, 159 U. S. 611, 627, 16 Sup. Ct. 174, 40 L. Ed. 278; Stanley County v. Coler, 190 U. S. 437, 445, 23 Sup. Ct. 811, 47 L. Ed. 1126; Coler v. Com'rs (C. C.) 89 Fed. 257, 261.

Wilkes County v. Coler, 180 U. S. 506, 519, 21 Sup. Ct. 458, 45 L. Ed. 642, was a case in which the Supreme Court of North Carolina had prior to the issue of the bonds indicated that it would rule as it did in cases decided after the issue of the bonds. We quote:

"After the decision in State v. Patterson, rendered as above stated before the bonds in suit were issued, it might have been anticipated that the same court would hold as they did in the subsequent cases. * * *" Page 517, of 180 U. S., page 462 of 21 Supt. Ct., 45 L. Ed. 642.

Consequently, nothing therein said can be properly considered as more than obiter as applied to the case at bar; for here there had been prior to the issue of the bonds no decision construing the Constitution as has since been done, and no intimation that such construction would ever be given it. We cannot believe that it was intended by the Wilkes county opinion (page 519, of 180 U. S., page 458, of 21 Sup. Ct., 45 L. Ed. 642) to hold that the federal courts cannot, in proper cases, independently construe state constitutions.

In addition to the cases cited hereinabove see Rowan v. Runnels, 5 How. 134, 139, 12 L. Ed. 85; Gelpcke v. Dubuque, 1 Wall. 175, 206, 17 L. Ed. 520; Havemeyer v. Iowa County, 3 Wall. 294, 303, 18 L. Ed. 38; Olcott v. Supervisors, 16 Wall. 678, 690, 21 L. Ed. 382; Thompson v. Perrine, 103 U. S. 806, 819, 26 L. Ed. 612; Taylor v. Ypsilanti, 105 U. S. 60, 70, 26 L. Ed. 1008; New Buffalo v. Iron Co., 105 U. S. 73, 75, 26 L. Ed. 1024; Railway Co. v. Doe, 114 U. S. 340, 352, 5 Sup. Ct. 869, 29 L. Ed. 136; Anderson v. Santa Anna, 116 U. S. 356, 362, 6 Sup. Ct. 413, 29 L. Ed. 633; Pleasant Township v. Insc. Co., 138 U. S. 67, 72, 11 Sup. Ct. 215, 34 L. Ed. 864; Loeb

v. Columbia, 179 U. S. 472, 492, 21 Sup. Ct. 174, 45 L. Ed. 280—all cases in which the Supreme Court of the United States had under consideration the construction of state Constitutions.

In Stanley County v. Coler, 190 U. S. 437, 444, 445, 23 Sup. Ct. 811, 47 L. Ed. 1126, the following language is used:

"The general rule undoubtedly is that we accept the interpretation put by the state courts upon the state Constitutions and statutes. There are exceptions to the rule. * * * Burgess v. Seligman was applied in Folsom v. Ninety-Six, 159 U. S. 611, 16 Sup. Ct. 174, 40 L. Ed. 278, to sustain the validity of bonds issued by the defendant township). * * * After the bonds were issued the Supreme Court of the state decided that the statutes authorizing the issue of the bonds were unconstitutional. There had been no decision to that effect prior to the issuing of the bonds. We held that the decision of the Supreme Court was not binding, and construed the Constitution and statutes for ourselves, and sustained the bonds."

It seems to us, therefore, clear that we should examine and construe the constitutional provision here in question, and in the light of such construction determine the validity or invalidity of the statutes under which the bonds were issued.

We have carefully considered the two North Carolina cases above referred to. In the Smathers Case, supra, the indication is that the court was of opinion that if there were no nay votes on the second or third reading of a roll-call bill, this fact must be affirmatively shown by a statement to this effect on the journal. In this respect, however, the statement of facts and the opinion are quite meagre, and the language of the latter is perhaps properly to be treated as mere dictum, as the statute there under consideration was clearly invalid because the first and second readings in the Senate took place on the same day.

In the case of Debnam v. Chitty, supra, the majority of the court held that the constitutional requirement had not been complied with. We quote as follows:

"We find on one page of the Journal the following written entry: 'H. B. 948, a bill to incorporate the Murfreesboro Railroad Company, passes its third reading by the following vote, and is ordered to be sent to the Senate without engrossment.' On the following page is a printed blank, which, with the entries in ink, reads as follows: 'H. B. 948; S. B. .... Messrs. Speaker (here follows the printed names of all the members of the House, with a simple (...) opposite ninety-four names). Ayes 94; nays ...: total ....' The only written entries are the figures '948' after the capital letters 'H. B.,' the dashes opposite the names, and the figures '94' after the word 'ayes.' The dotted lines after the letters 'H. B.' and 'S. B.,' and after the words 'ayes' and 'nays' and 'total,' are all printed. There is not the scratch of a pen after the words 'nays' and 'total.' From this it appears that 94 members whose names are marked voted in the affirmative, while there is no statement as to those voting in the negative. If there were any members voting in the negative, their names should have been entered upon the journal; while if there were none so voting, that fact should be affirmatively stated. To say that the mere failure to fill out a printed blank is an affirmative declaration that there were no nays is a proposition that does not commend itself either to our views of language or of law."

The following is taken from the dissenting opinion of Judge Clark:

"There being some doubt as to the accuracy of the printed journals, a certified transcript of the passage of this act from the manuscript journals has been made a part of the record, from which it appears as follows:

" 'House Journal, 41st day.

" 'H. B. 948. Passes its second reading, ayes 70' (names being entered) : 'noes, none.'

" 'House Journal, 46st day.

" 'H. B. 948. Passed third reading by following vote: ayes, 94' (giving names) 'nays, . . .'

"The expression, 'Passes by the following vote, ayes 94' (giving names) ; 'nays, . . . .' is as express and intelligent a declaration that there were no negative votes as if the word 'none' had been used.

" 'Nays, . . .,' after the words, 'passes by following vote,' and giving those voting aye. can convey no other meaning. Is it not hypercritical to say that 'nays, . . . .' did not mean that there were no names in the negative?

"The Constitution requires that the 'ayes' and 'noes' shall be entered on the journal, and it cannot be seen that this requirement has been complied with when it does not affirmatively appear that there were no 'noes,' but that fact does sufficiently and clearly appear from above transcript of the journal of the House. It is but just to the plaintiff to say that when he brought this action and filed his complaint, he had only before him the printed journals, which omit the words (on the third reading in the House) 'nays, . . .,' which do appear in the manuscript journal."

After the most careful consideration that we have been able to give the subject, we find ourselves unable to adopt the construction given the clause in question by the learned Supreme Court of North Carolina. Recurring now to the journal entries in the case at bar, we are of opinion that these entries comply with the constitutional requirement. We shall for present purposes, without expressing an opinion on the question, assume that if there are a minority of members voting nay on a roll-call bill, a record should be made of such nay votes, as well as of the yea votes. But under this assumption the utmost that can be said, as we think, is that it was the duty of the clerks of the House and Senate to record both the yea and the nay votes. We cannot presume that these officers failed to perform this duty. Indeed the presumption is just the reverse. As was said in Brodnax v. Groom, 64 N. C. 244: "The courts must act on the maxim 'Omnia præsumuntur.'" Giving effect, then, to this presumption, we are bound to act on the supposition that there was no negative vote cast on either of the roll calls above mentioned. It follows that the only votes cast were yeas, and these were recorded. While the yea votes, if any are cast, are to be recorded, and while the nay votes, if any such are cast. are to be recorded : yet if no member votes nay there are of course no nay votes to be recorded. Hence, for the clerk, under such circumstances, to write in words on the journal—"Nay votes none"—seems to us to be mere work of supererogation, certainly not required under any assumption by the letter of the Constitution.

The reasoning above may perhaps be better expressed in slightly different form. It is the duty of the clerk to enter the nay votes as well as the yea votes. If the record shows only yea votes, the clerk has either (1) failed to do his duty; or (2) there were no nay votes. The court, under the circumstances of the case here, must presume that the clerk has done his duty. Consequently, the only permissible deduction is that there were no nay votes. It follows that the clerk has recorded every vote cast, and has certainly complied with the constitutional provision in so far as its meaning is expressed.

In Debnam v. Chitty the Constitution is construed to mean: It is the duty of the clerk to enter the yea and the nay votes, and, if there be no nay votes, it is further his duty to affirmatively so state. The Constitution is not thus written, and we find ourselves unable to reach the conclusion that such intent is either necessarily or fairly to be implied. The subject then under consideration by the constitutional convention was known to be of such far-reaching importance that we are constrained to believe that such intent, had it existed, would not have been left to mere implication. Moreover, we have been able to think of no sufficient reason for adding to the Constitution by implication such a requirement. If all the votes cast are affirmative (and it is clear that such is here the only permissible hypothesis), and if all these are duly entered, we do not perceive why the Constitution makers should have intended that something further be added to the record; especially as such further matter is necessarily a mere conclusion, which under the rules of law must be drawn in any event from the silence of the record. The Constitution in the words selected by its authors requires the entry of votes. In entering on the journal "nay votes none," the clerk is undeniably not entering nay votes. As the Constitution is silent concerning nay votes in cases where the only votes cast are yeas, we think the proper, if not the necessary, implication is that no entry concerning the nonexistent nay votes is required.

But it is not necessary that it should be conclusively shown that the implied intent found by the Supreme Court of North Carolina should not be found to exist. It is all-sufficient if there be a reasonable doubt as to the existence of an intent which can be found only by implication, and surely the absence of any good reason for adding to the requirements of the Constitution by implication is sufficient to create such doubt. "On more than one occasion this court has expressed the cautious circumspection with which it approaches the consideration of such question, and has declared that in no doubtful case would it pronounce a legislative act to be contrary to the Constitution." Dartmouth College v. Woodward, 4 Wheat. 518, 625, 4 L. Ed. 629. "* * * If I could rest my opinion in favor of the constitutionality of the law on which the question arises on no other ground than this doubt, so felt and acknowledged, that alone would in my estimation be a satisfactory vindication of it."

Ogden v. Saunders, 12 Wheat. 213, 270, 6 L. Ed. 606. "The question to be determined is whether the statute in this respect is valid. * * * The duty which the court is called upon to perform is always one of great delicacy, and the power which it brings into activity is only to be exercised in cases entirely free from doubt." Von Hoffman v. City, 4 Wall. 535, 549, 18 L. Ed. 403. "This court has the power to declare an act of Congress to be repugnant to the Constitution, and therefore invalid. But * * * every doubt is to be resolved in favor of the constitutionality of the law." The Mayor v. Cooper, 6 Wall. 247, 251, 18 L. Ed. 851. "In Commonwealth v. Smith [4 Binn. 123] the language of the court was: 'It must be remembered that for weighty reasons it has been assumed as a prin-

ciple in construing Constitutions by the Supreme Court of the United
States, by this court, and by every other court of reputation in the
United States, that an act of the Legislature is not to be declared
void unless the violation of the Constitution is so manifest as to leave
no room for reasonable doubt.' And in Fletcher v. Peck [6 Cranch,
87, 3 L. Ed. 162] Chief Justice Marshall said: 'It is not on slight
implication and vague conjecture that the Legislature is to be pro-
nounced to have transcended its powers and its acts to be considered
void. The opposition 'between the Constitution and the law should
be such that the judge feels a clear and strong conviction of their
incompatibility with each other.' It is incumbent, therefore, upon
those who affirm the unconstitutionality of an act of Congress to show
clearly that it is in violation of the provisions of the Constitution.
It is not sufficient for them that they succeed in raising a doubt."
Legal Tender Cases, 12 Wall. 457, 531, 20 L. Ed. 287. "Every pos-
sible presumption is in favor of the validity of a statute, and this
continues until the contrary is shown beyond a rational doubt.
* * * The safety of our institutions depends in no small degree
on a strict observance of this salutary rule." Sinking Fund Cases,
99 U. S. 700, 718, 25 L. Ed. 496. "The elementary rule is that
every reasonable construction must be resorted to, in order to save
a statute from unconstitutionality." Hooper v. California, 155 U. S.
648, 657, 15 Sup. Ct. 207, 39 L. Ed. 297. "Such act is presumed to
be valid unless its invalidity is plain and apparent. No presumption
of invalidity can be indulged in; it must be shown clearly and un-
mistakably. This rule has been stated and followed by this court
from the foundation of the government." U. S. v. Ry. Co., 160 U.
S. 668, 680, 16 Sup. Ct. 427, 40 L. Ed. 576. "* * * Before a
court is justified in holding that the legislative power has been ex-
ercised * * * in conflict with restrictions imposed by the funda-
mental law, the * * * conflict should be clear." Fairbank v.
U. S., 181 U. S. 283, 285, 21 Sup. Ct. 648, 45 L. Ed. 862.

It will be observed that we do not base our conclusion on the dis-
tinction, noted in the dissenting opinion above quoted in Debnam v.
Chitty, between an entire want of entry concerning nonexistent nega-
tive votes and the entry—"Nay ...." To write or have printed the
word "nay" at the foot of a roll-call record, and to leave entirely
blank 'the space thereafter intended for the number of negative votes,
seems to us practically the same thing as making no mention of nay
votes. We prefer to base our conclusion on the grounds above stated.

The objection that the record of the voting does not give more than
the surnames of the members of the general assembly seems to us to
be without merit. From the copy of the House Journal set out above
it will be seen that, where there happened to be two members of the
House of the same surname, they are distinguished by stating their
respective counties. Consequently, giving the surnames on the jour-
nal is a sufficient compliance with the Constitution.

The amendment, referred to as chapter 404, p. 706, Acts 1887, was
not passed by a roll-call vote. We have been unable, however, to
perceive any reason why it should have been necessary to thus enact

it. This act does not impose any tax, or allow any county, city, or town to do so. See Brown v. Stewart, 134 N. C. 357, 46 S. E. 741, Com'rs v. Stafford, 138 N. C. 453, 50 S. E. 862.

One objection to the validity of the bonds is based on the contention that they were not legally executed. The bond copied in the record reads as follows:

"United States of America.

"State of North Carolina. County of Onslow.

"Six Per Cent. Ten-Forty Year Coupon Bond.

"Interest Payable Annually on the First Day of January in Each Year.

"Principal Payable on the First Day of January, A. D., Nineteen Hundred and Thirty-Six.

"Know all men by these presents. that for value received, the County of Onslow, in the State of North Carolina. promises to pay to ―――― or bearer, the full sum of five hundred dollars. Lawful money of the United States of America, payable at the office of the County Treasurer of said County of Onslow, on the first day of January, Anno Domini, nineteen hundred and thirty-six, with interest on said principal sum at the rate of six per cent. per annum until paid. Said interest payable annually, on the first day of January, in each year at the office of said Treasurer of the County of Onslow, according to the tenor of the coupons hereto annexed, upon presentation and surrender of said coupons, respectively.

"This bond is one of a series of sixty bonds, forty of which are of the denomination of five hundred dollars each. and twenty of which, are of the denomination of one thousand dollars each. All of like date and tenor aggregating forty thousand dollars, and numbered consecutively from one (1) to sixty (60), inclusive; with option to said county of Onslow, to redeem any or all of the bonds of this series, at any interest period, after ten years, from the date thereof, upon payment of principal and all interest due at the time of redemption; executed and delivered in pursuance of a vote of a majority of the qualified voters of the said county of Onslow at an election held in said county, on the twenty-fourth day of January, 1888. By order of the Board of County Commissioners of said Onslow County, pursuant to an Act of the General Assembly of North Carolina. Entitled 'An Act to incorporate the Wilmington, Onslow and East Carolina Railroad Company.' Ratified the fifth day of March, Anno Domini, eighteen hundred and eighty-five, and acts amendatory thereof.

"In witness whereof, the said County of Onslow, has caused this bond to be signed by the Chairman of its Board of County Commissioners, and countersigned by the clerk of said board, and by the Treasurer of the said County, and has caused its corporate seal to be hereto affixed, and the attached coupons to be attested by the signature of the said Treasurer of the County this first day of January, Anno Domini. eighteen hundred and ninety-six.

"C. C. Morton;

"Clerk of the Board of County Commissioners of Onslow County, N. C.

"D. J. Sanders,

"Chairman of the Board of County Commissioners of Onslow Co., N. C.

"[Seal of Board of Commissioners of Onslow County.]

"J. F. Cox, Treasurer of Onslow County, N. C."

In considering the question here raised we shall leave out of view any possible application of the doctrine of estoppel. The language of the act of 1885, in so far as now of importance, is found in section 14, ante. The amendments do not seem to affect the question before us. · While the act above quoted is not as specific as it might be concerning the execution of the bonds, we are satisfied that the direction that the bonds "of said county" are to be "issued" by a

board of trustees should not be construed as requiring that the bonds should be executed by the trustees. The word "issue" was, we think, used in its ordinary sense, and means "send out," "emit," "deliver." See 4 Words & Phrases, 3779, Corning v. Com'rs, 102 Fed. 57, 60, 42 C. C. A. 154; Perkins County v. Graff, 114 Fed. 441, 444, 52 C. C. A. 243. As the act of 1885 is therefore silent on the subject of the execution of the bonds, we think the intent was that the bonds should be executed by the board of commissioners of Onslow county. By section 702 of the Code of North Carolina, every county is declared a body politic and corporate. By section 703 the powers of a county are to be exercised by the board of commissioners, or in pursuance of a resolution adopted by them. One of the powers of the counties to be thus exercised is (section 704, Code) to make contracts. By section 712 it is made the duty of the clerk of the board "to record all the proceedings of the board; to enter every resolution or decision concerning the payment of money; and to record the vote of each commissioner on any question submitted to the board, if required by any member present." The records kept by the clerk of the board do not show a formal resolution directing the execution of the bonds The record of the meetings of March 3, 1896, and of April 6, 1896. read as follows:

"Commissioners met Tuesday March 3, 1896, according to adjournment for the purpose of issuing bonds to the W. N. & N. Railroad and other business.

"Present: D. J. Sanders, Chairman, A. N. Sanderlin, John Gurganus, G. D. Mattocks. G. H. Simmons.

"Whereas, suits have been brought against the commissioners of Onslow county by the Wilmington, Onslow and East Carolina Railroad Company (now the Wilmington. Newberne and Norfolk Railway Company) and by the Wilmington. Newberne and Norfolk Railway Company to compel the issue of sixty thousand dollars of bonds of said county in payment of the subscription by said county to said railroad company, in pursuance of an election held January 24, 1888, and in accordance with the provisions of the act of 1885, (page 439, chapter 233) and the amendments thereto, which said suits are pending in the superior court of Lenoir county. N. C.

"Whereas, compromise of said suits has been effected whereby the county of Onslow by surrendering its claim to any of the capital stock in said railroad company. such stock being regarded as of little or no value, will save to the taxpayers of said county a large sum of money, viz., twenty thousand dollars principal in bonds and interest thereon.

"Now, therefore. it is ordered by the board of commissioners of Onslow county. that the following adjustment and compromise of said suits. as heretofore agreed upon by the parties thereto, be accepted and spread upon the records of the board of commissioners as a final settlement of said suit, viz.:

"First. The railroad company shall surrender its claim to twenty thousand dollars of bonds heretofore voted. It shall surrender all back interest claimed to be due on all such bonds. It shall pay all the cost of said suits not heretofore adjudged against the defendants, and all the cost of printing the bonds to be issued. except the sum of twenty-five dollars.

"Second. The county commissioners shall issue to the Wilmington. Newberne and Norfolk Railway Company, the successor of the aforesaid Wilmington, Onslow and East Carolina Railroad Company, forty thousand dollars in coupon bonds as follows: 'forty bonds of five hundred dollars each and twenty bonds of one thousand dollars each, to be executed according to law, to bear interest at six per cent., payable annually, principal and interest. payable in lawful money of the United States, said bonds to mature in forty years from January 1, 1896. with option to the county to redeem any or all of said bonds at the end of ten years; and the county shall surrender all claim to any of

145 F.—49

the capital stock of the said railroad company, and shall pay twenty-five dollars towards the expense of engraving or printing said bonds, which bonds shall be ordered by the said railroad company and presented to the board of county commissioners to be properly executed.

"Ordered, that the Wilmington, Newberne & Norfolk R. R. Company be allowed $25 for amount agreed to be paid by county on printing bonds, etc. Ordered that M. D. W. Stevenson be allowed $265, to be made in three vouchers, two for $100 each and one for $65 for fees in R. R. case. Ordered that E. Gilman be allowed $235 on vouchers as follows, one for $125, two vouchers $55 each, fees for R. R. case. Ordered that F. Thompson be allowed $200 for services as attorney in railroad suit. Ordered that the receipt of Col. A. M. Waddell for the W. N. & N. Railroad be accepted, and the clerk record the same and file the original.

"Commissioners met first Monday in April, it being the 6th day.

"Present: D. J. Sanderlin, Chairman, G. D. Mattocks, G. H. Simmons, A. N. Sanderlin, John Gurganus.

"Ordered that J. F. Cox be allowed $2.50 for signing county railroad bonds March 3, 1896."

The parol evidence is to the effect that after the board had convened for the purpose of executing these bonds, and in the board room, the chairman, the clerk of the board, and the county treasurer signed the bonds, and the county treasurer alone signed the coupons. Who impressed the seal on the bonds and when it was done does not appear. All five of the members of the board were present during at least a part of the time required for the signing, and the board was in session during all of the time. A careful reading of the evidence has satisfied us that the execution of the bonds was done in the presence of at least a majority of the board, with the full approval of the entire board, and that such execution was intended to be the act of the board. It cannot be asserted that there was a formal resolution put and carried to the effect that the board execute the bonds in the manner above stated, but what was done was, we think, equivalent thereto.

Speaking of private corporations, Prof. Page says:

"The board of directors, acting at lawful meetings, is the chief agency for directing and controlling the business of the corporation. The acts of such board at a lawful meeting bind the corporation, though no formal resolution to make the contract in question is adopted. The fact that no written record of the proceedings of the board of directors is kept does not prevent their conduct from binding the corporation." 2 Page, Contracts, § 979.

In 4 Thompson on Corporations, § 4624, in speaking of corporate contracts executed by the president of the company, it is said:

"* * * If the person dealing with the corporation is driven to make proof of the authority of its president to act for it and bind it in the particular transaction, then there is a principle that this proof need not be made in the form of a resolution of the board of directors, duly entered upon the records of the corporation, conferring the authority upon the president; but that the act of the directors may be shown by an oral vote, and may be otherwise proved by parol, and often, equally well, by circumstantial evidence."

And again (5 Thompson on Corporations, § 6175) it is said:

"On principles elsewhere considered, an authorization by the directors to the ministerial officers of the corporation, to execute even so important an instrument as a mortgage of its properties, need not be shown by any formal

resolution of their board; but the presence of the corporate seal upon the instrument, with the signatures of the proper officers, generally the president and secretary, is presumptive evidence that the proper precedent authority had been given. If such officers execute the instrument with the knowledge and concurrence of the directors, or with their subsequent and long-continued acquiescence, it will be regarded as the act of the corporation, although there was no precedent authority by a formal resolution or vote."

In 17 Am. & Eng. Ency. (1st Ed.) p. 86, it is said:

"It is not necessary that all the doings of a board of directors should be entered upon their records, but the corporation will be bound by any verbal order or direction in which a majority of such directors concur in relation to any business deputed to them."

In 21 Am. & Eng. Ency. (2d Ed.) p. 50, it is said:

"It is essential to the validity of municipal bonds that they be signed by or with the authority of the officers designated by the statutes. * * * In the absence of any statutory direction, municipal bonds may be signed by any officer of the municipality whom its governing boards designate therefor."

See, also, Montgomery v. Township (C. C.) 43 Fed. 363.

As to the propriety of receiving parol testimony to show the facts concerning the execution of the bonds, see 1 Dillon, Municip. Corps. (4th Ed.), § 300 (237); Bank v. Dandridge, 12 Wheat. 64, 6 L. Ed. 552; Bridgford v. City (C. C.) 16 Fed. 910; Allis v. Jones (C. C.) 45 Fed. 148; Rondot v. Rogers Township, 99 Fed. 202, 210, 39 C. C. A. 462.

The validity of the election held under the act of 1885 has been decided in the suit the railroad company instituted against the county commissioners, reported in 116 N. C. 563, 21 S. E. 205. The objection that delivery of the bonds was made by the board of county commissioners, and not by the board of trustees, as directed by the statute above mentioned, seems to us without merit. We regard the provision as merely directory, and therefore of such nature that disregard thereof could not have the effect of invalidating the bonds. Again, we think this provision was made solely for the benefit of the railroad company. As we read the statute, the intent was that the county commissioners should execute all of the bonds, and put them in escrow, so to speak, in the hands of the trustees, to be by the latter delivered from time to time as the work of construction advanced. The refusal of the commissioners to execute the bonds, and the delay caused by the resulting litigation, made the use of the method provided by the statute unnecessary. The railroad company therefore waived, as it had the right to do, the provision in question, and elected to receive the bonds accepted in compromise directly from the county commissioners. The fact that the bonds issued provide for annual payments of interest, while the act of 1885 specified semiannual interest payments, seems to us of no moment. This provision was made for the benefit of the railroad company. If the company was willing to and did waive the benefit thereof, and accepted bonds providing for only annual interest payments, such fact cannot invalidate the bonds; and such contention is not made. With the argument that this departure from the terms of the act of 1885 prevents appellee from claiming the rights of an innocent holder for value we need not concern ourselves.

It is urged upon us by the learned counsel for appellants that the bonds here are invalid because the statute under which these bonds were issued authorized the issue of bonds only in payment for stock of the railroad company. We find it unnecessary to here consider the question of estoppel relied on by counsel for appellee.

The result of the election and the ruling of the Supreme Court of North Carolina in the suit of Railroad Company v. Com'rs, 116 N. C. 563, 21 S. E. 205, above referred to, made it incumbent on the county commissioners to subscribe to the stock of the railroad company to the extent of $60,000, and to issue a like amount of county bonds in payment of such subscription. At the time of the compromise between the railroad company and the county commissioners the stock was valueless. There·is not a suggestion of fraud or wrong, or even of error of judgment, on the part of the commissioners in agreeing to issue only $40,000 of bonds, and to relinquish all claim to the worthless stock. Express authority to thus act is not given in the statute of 1885. But we think, nevertheless, that the board had authority so to act. The powers of a county, to be exercised by its board of county commissioners (section 703, Code), are, inter alia: (1) To sue and be sued in the name of the board of commissioners. (2) To make·such contracts, and to purchase and hold such personal property, as may be necessary to the exercise of its powers. (3) To make such orders for the disposition or use of its property as the interest of its inhabitants require. Code, § 704. The statutes were enacted in 1868 and re-enacted as sections of the Code in 1883. Certainly the act of 1885 was passed and is to be considered with reference to these sections of the Code. .If the commissioners had subscribed for $60,000 of the railroad company's stock, and had issued an equal amount of bonds therefor, we apprehend that no one would question the right of the commissioners thereafter, acting in good faith and in the "interest of the inhabitants" of the·county, to exchange the valueless stock for $20,000 of the bonds, surrender the stock, and destroy such bonds. Such power is undoubtedly given by the Code sections above quoted, and is not affected by anything in the act of 1885; and, as the method pursued by the commissioners is the exact equivalent of the course which they might have followed, it seems clear that no valid objection can be founded on such acts. Again, the power to sue and to defend suits carries with it, by necessary implication, the power to make bona fide compromise adjustments of such suits. 1 Dill. Mun. Corp. (4th Ed.) § 477 (398), and notes; 15 Am. & Eng. Ency. (1st Ed.) p. 1050, and notes. The compromise agreement here was not only entirely free from fraud, but, as the stock was valueless, it was beneficial to the interests of the county.

It follows from what has been said in regard to the constitutionality of the act of 1885 and the amendments thereto that we find it unnecessary to consider the contention that authority to issue the bonds in question can be found in sections 1996, 1998, and 1999 of the Code.

That the trial court had jurisdiction of the case at bar on the equity side seems clear. The remedy of complainant below at law was not

adequate or complete. Moreover, the fund in the hands of the county treasurer arose from taxes levied and collected for the payment of the January 1, 1904, coupons. Under the allegations made in the bill and under the facts in evidence, this fund is impressed with a trust in behalf of the appellee and the other owners of the coupons. Coler v. Board (C. C.) 89 Fed. 257, 260; McKee v. Lamon, 159 U. S. 317, 322, 16 Sup. Ct. 11, 40 L. Ed. 165.

In conclusion, it should be stated that we find what appears to us to be an inadvertent error in the decree of November 11, 1905, in a respect not assigned as error. The complainant is the owner of the 1904 coupons, of only 19 of the 20 $1,000 bonds, and of only 30 of the 40 $500 bonds. The decree orders the county treasurer to put into the hands of the receiver the entire proceeds of the tax levied to pay the 1904 coupons. We doubt if the court below had authority to require the surrender of such part of the fund as does not belong to the appellee. This decree, as we construe it, also requires the county treasurer to pay to the receiver a sufficient sum to cover interest on the amount at least due appellee since January 1, 1904. That appellee has a right to recover a judgment for interest is not here questioned; but, if the treasurer is to pay the interest on appellee's coupons out of a fund sufficient only to pay the principal of all of the 1904 coupons, it is evident that an injustice may be done the holders of the remaining coupons of that year. We are, of course, not now called upon to express an opinion as to the proper method to be pursued by appellee to secure payment of interest on the sum which should have been paid to him on January 1, 1904. While, under rule 11 of the court (90 Fed. cxlvi, 31 C. C. A. cxlvi), we can notice this apparent error and direct a modification of the decree, we do not think it necessary to do so. This feature of the decree was not assigned as error, and counsel for appellants on the argument advised us that all that was wanted was an adjudication of the validity or invalidity of the bonds. The lower court can if it seems proper to it modify the decree in the respects mentioned. Under the circumstances here, we do not deem it necessary to direct such modification. We are therefore of opinion to affirm and remand the cause for such further proceedings as may be proper.

Affirmed.