## PUGET SOUND POWER & LIGHT CO. v. CITY OF SEATTLE et al.

(District Court, W. D. Washington, N. D.   April 23, 1921.)

No. 235.

1. **Dismissal and nonsuit** �kö=53(1)—**Suit which had become moot should be dismissed on any showing of that fact.**

   Though there is a question as to the propriety of considering an affidavit on motion to dismiss the bill, a suit should be dismissed in the interests of the public and the court whenever the controversy has become moot, regardless of how that issue is presented or suggested.

2. **Municipal corporations** ⊱=955(2)—**Political activities of mayor against bond payments not acts of city, and though of evidential value are not to be considered on motion to dismiss for want of equity.**

   In a bill to compel a city to comply with its contract provisions for securing the payment of bonds, allegations that the mayor had been carrying on a campaign to intimidate city officers and cause default in the payment of the interest and the repudiation of the bonds, even though such activities may have evidential value as bearing on the attitude of the city, cannot be considered in determining motion to dismiss the bill for want of equity, since the acts of the mayor are not the acts of the city which in matters of that character can under its charter speak and act only by ordinance.

3. **Municipal corporations** ⊱=954—**Payment of interest into special fund month before due held contract requirement.**

   In an ordinance authorizing the issuance of bonds, a section whereby the city irrevocably obligated itself to pay into a special fund from the gross revenues of its street railway system before each installment of interest falls due a sum equal thereto, and requiring the city treasurer one calendar month prior to the date on which the interest became due to set aside the amount thereof, the provision for setting the interest aside one month before due is part of the contract obligation binding on the city and not merely a directory provision.

⊱=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. **Action** ⊂⊃9—**Suit to compel city to set aside fund for interest on bonds not moot in view of contention that city need not pay interest into special fund at time fixed, though installment due has been paid.**

In a suit to compel specific performance of a city's obligation to set aside in a special fund from the revenues of its street railway system the amount of the interest on its bonds one month before such interest became due, a contention by the city that the requirement of payment into such fund at the time specified was directory and not obligatory, which amounted to a threat to treat the fund in the same manner when future installments fell due, affects the market value of the bonds, so that the fact that the city had paid the interest installment then due into such fund does not render the controversy moot.

5. **Municipal corporations** ⊂⊃955(1)—**Equity can enforce contract of city to provide fund for payment of interest on bonds.**

Equity can specifically enforce the provisions in a contract whereby a city obligated itself to pay from the gross revenues of its street railway system a sufficient amount to meet an installment of interest into a special fund for that purpose one month before payment is due, where the city contended that provision was directory, which amounted to a threat to disregard it when future installments fell due, since such enforcement does not interfere with the governmental activities of the city and removes a cloud upon the bonds and avoids a multiplicity of actions in which the damages would be difficult of ascertainment.

In Equity.   Suit by the Puget Sound Power & Light Company against the City of Seattle and others.   On defendants' motion to dismiss the bill, on the ground that complainant is not entitled to equitable relief.   Motion denied.

James B. Howe, Hugh A. Tait, and John H. Powell, all of Seattle, Wash., for complainant.

Walter F. Meier, Corp. Counsel, and Thomas J. L. Kennedy, Robert H. Evans, and Charles T. Donworth, Asst. Corp. Counsels, all of Seattle, Wash., for defendants.

CUSHMAN, District Judge.   Complainant, a Massachusetts corporation, sues the defendant city, its comptroller and treasurer.   The matter is now before the court upon defendants' motion to dismiss the bill upon the ground that the complainant is not entitled to equitable relief.

The bill avers that complainant was the owner of and operated a street car system in the city of Seattle; that, in 1918, during the war, complainant was pressed by the government and the city to make additions to its system which it had not the means of making; that in September, 1918, the city offered complainant $15,000,000 in utility bonds for the property, which it accepted; that, after the enactment of an ordinance authorizing the purchase and issuance of such bonds, a taxpayers' suit was brought in the state court to test the validity of the purchase and the proposed bonds. The particular attack being made was that the general revenues of the city would have to meet the charges of operation and maintenance if the gross receipts from the operation of the street car system proved insufficient to meet the bonds, interest, and other charges.   In both the lower and Supreme Court the

bonds were held valid. Twichell v. Seattle, 106 Wash. 32, 179 Pac. 127.

That, at the date of this decision, the street car property was still in the possession of the complainant, being subject to outstanding mortgages, which complainant was obligated to discharge; that complainant transferred the property, as agreed, the trust companies holding the mortgages released them, and received the bonds as security, substituted for the released mortgages; that $15,000,000 of complainant's notes so secured mature June 1, 1921; that the interest on the utility bonds of the city is to be applied to the payment of the interest on such notes; that, since such transfer of the property, the city has been in possession and operation of the street car system transferred, receiving therefrom approximately gross revenues of $18,000 per day.

That Ordinance No. 39025, authorizing the utility bonds, provides that—

"Sec. 5. * * * The city treasurer of the city of Seattle shall, semiannually, one calendar month prior to the date upon which any interest, or principal and interest, shall become due, set aside and pay into such fund from the gross revenues of the entire municipal street railway system of the city of Seattle, now belonging to it, including the additions, betterments and extensions herein provided for, and any street railway property which it may hereafter acquire, with the equipment thereof, a sum equivalent to the amount of interest so falling due, upon all bonds issued hereunder, and then outstanding, and annually one calendar month prior to the first day of March in each and every year, beginning with the year 1922, and to and including the year 1938, the sum of eight hundred thirty-three thousand dollars ($833,000), and one calendar month prior to the first day of March, 1939, the sum of eight hundred thirty-nine thousand dollars, ($839,000), as the principal of such bonds falls due, and until all of such bonds with interest thereon be fully paid, and such fixed amounts out of such gross revenues are hereby pledged to such semiannual payments of principal, and shall constitute a charge upon such gross revenues superior to all charges whatsoever, including charges for maintenance and operation, save and except the charges upon such revenues heretofore created for the payment of principal and interest of one hundred thousand dollars ($100,000), Seattle Municipal Street Railway Bonds, 1917, authorized by Ordinance No. 37851, as amended by Ordinance No. 37923; and save and except the charges upon such revenues heretofore created for the payment of principal and interest of five hundred fifty thousand dollars ($550,000), 'Railway Extension Bonds, Series A, 1918,' authorized by Ordinance No. 38666, and save and except the charges upon such revenues sufficient to pay warrants drawn upon the city railway fund of the city of Seattle issued prior to the taking effect of this ordinance."

That, between the 31st of March, 1919, and the 17th day of February, 1921 (the bill of complaint herein having been filed February 21, 1921), the city received in gross revenues from the operation of the purchased property upwards of $7,000,000, being more than enough to pay all charges prior to complainant's, the interest on the utility bonds and even several installments of the principal—

"But, notwithstanding such fact, such gross revenue has been applied to the building of an extension and to the payment of the cost of maintenance and the operation of the municipal street railway system of the city. 'On the 1st day of March, 1921, six months' interest on the issue of $15,000,000 of utility bonds will be due and payable and by the terms of the ordinance authorizing such bonds the city is obligated, in case the gross revenues derived from the operation of the system were sufficient, to pay into the special fund created

by such ordinance the sum of $375,000, but such sum has not yet been paid into such special fund although the gross revenues received by the city from the municipal street railway system were more than sufficient to pay all prior charges and to pay such interest, and to pay the amount of such interest into such special fund 30 days prior to the 1st day of March, 1921; but the mayor of the city has recommended that instead of the gross revenues derived from such system being paid into such special fund the same should be diverted and in part applied to the payment of interest on $790,000 of utility bonds issued under Ordinance No. 39492, entitled, * * * which last-named bonds are expressly made subordinate to the $15,000,000 issue of bonds hereinbefore mentioned, and which $790,000 issue of utility bonds were sold by the city in the public bond market after it had operated the property for five months or more."

The bill further avers that certain named parties have combined to have a suit instituted to have the $15,000,000 bond issue decreed payable only out of the net revenues of the property and to enjoin the payment of interest due March 1, 1921, and the principal until after the payment of maintenance and operation charges, and that the mayor of the city has been carrying on a campaign for the purpose of intimidating certain city officers and bringing about the default in the payment of the interest on such bonds and their repudiation; that the persons so combining have, with other persons, instituted a suit in the state court to subordinate the payment of interest and principal to claims that are subordinate to the bonds; that complainant is not a party to those suits, but such persons may attempt to involve complainant in such suits in order to prevent its being heard in this court; and further that—

"If, by reason of the efforts of the mayor and certain other persons who have combined with him to bring about a default in the payment of interest on the fifteen million dollar issue of bonds, which interest is payable on the 1st day of March, 1921, a default should occur in the payment of such interest, the entire issue of $15,000,000 of bonds will be known as a defaulted issue, and bonds which the company now has deposited with the trustees hereinbefore named, as collateral security, will be depreciated millions of dollars and the company may be placed in a position where it will be unable to have such trustees sell such bonds prior to the 1st day of June, 1921, and apply the proceeds upon the notes secured thereby, and the company will suffer great and irreparable injury and damage exceeding in value the sum of $3,000 exclusive of interest and costs and exceeding many millions of dollars, as well as the injury and damage which will be immediately caused by the nonpayment of the $375,000 of interest on such bonds, which interest is payable March 1, 1921. If the city treasurer places in the special fund the gross revenues from the municipal street railway system, which should have been placed in such fund on the 29th or 30th of January, 1921, or if he should place in such fund the gross revenues of the municipal street railway system received during the month of February, 1921, there would be sufficient funds to pay such interest on the 1st day of March, 1921."

Complainant avers that this will result in irreparable injury to it; that its only remedy is by injunction, forbidding the diversion of the gross revenues from the special fund and commanding their payment into such fund. Complainant asks for a temporary and permanent injunction in accordance with the averments made, for specific performance, and specially prays:

" * * * That in the event any attempt should be made by any taxpayer to sue it in the superior court of the state of Washington or in any other court

·than the District Court of the United States for the Western District of Washington, it shall be granted leave to amend this complaint so as to enjoin all persons so attempting to sue it from suing it in such manner as to divest this court of complete jurisdiction of the rights which the·plaintiff has to assert against the city and its officers; and that the plaintiff have such other and further relief as the equities of the case may require, and to your honors may seem meet."

A restraining order having been issued by this court February 21st, upon the filing of the bill, on February 25th, the affidavit of the defendant city treasurer was filed herein, which affidavit avers:

"I am now, and for more than nine years last past have been, the duly elected, qualified and acting treasurer of the city of Seattle, a municipal corporation, and in my official capacity I am, together with the city of Seattle, a defendant in the above entitled action.

"On the 1st day of February, 1921, pursuant to the provisions of Ordinance No. 39025 of the city of Seattle * * * I began to set aside and pay into the 'Municipal Street Railway Bond Fund, 1919,' created by said ordinance, from .the gross revenues of the entire municipal street railway system of the city of Seattle, a sum sufficient to pay the interest accruing March 1, 1921, hupon the issue of Municipal Street Railway bonds in the principal sum of $15,000,000.

"On the 11th day of February, 1921, I was served with a temporary restraining order, issued by the superior court of the state of Washington for King county, in cause No. 149200, wherein S. B. Asia and others were plaintiffs, and the city of Seattle, myself, and one other were defendants, which restraining order enjoined affiant and the other defendants from placing the gross earnings of said street railway system in the 'Municipal Street Railway Bond Fund, 1919,' created by said Ordinance No. 39025, and further restraining the defendants from placing the gross earnings of said street railway system into any , fund other than the street railway fund unless all charges incurred in the operation of said system were first paid. On said 11th day of February, 1921, said fund contained $167,481.61. Pursuant to said restraining order, I thereafter held said gross revenues in the unapportioned street railway collections account, and refrained from paying further sums into said bond fund until the said restraining order was dissolved.

"On the 25th day of Febuary, 1921, the date to which said restraining order was continued in effect, said restraining order was abandoned by the plaintiffs in said cause No. 149200 and stricken. As soon as said restraining order became ineffective, I paid into said municipal street railway fund, 1919, created by said Ordinance No. 39025, from said unapportioned street railway collections account above referred to, the sum of $207,518.39, making a total of $375,000, being the amount of interest which will be due and payable upon said $15,000,-000 bond issue on March 1, 1921, and by telegraph transmitted the said $375,000 (together with other sums) to the fiscal agency of the state of Washington located in New York City, to wit, the Equitable Trust Company, 37 Wall street, to be paid out upon presentation of the interest coupons attached to said $15,000,000 issue in accordance with the terms of said ordinance.

"On the 21st day of February, 1921, I was served with a motion for a temporary injunction in the above entitled cause, in which the plaintiff seeks an interlocutory injunction restraining the defendants herein from using any portion of the gross revenues derived from the municipal street railway system for the payment of interest upon other bond issues until the amount necessary to pay the interest upon the $15,000,000 bond issue accruing on March 1, 1921, be paid. As already stated herein, I have paid into the special fund referred to in said motion the sum of $375,000, being the amount of interest due upon said $15,000,000 bond issue on March 1, 1921, and have transmitted the same to the fiscal agency of the state of Washington in New York City for payment in accordance with the terms of said bonds and said Ordinance No. 39025."

[1] There doubtless is a question as to the propriety of considering the showing made by the affidavit on a motion to dismiss the bill; but, if the cause has become entirely moot by the payment of the installment of interest due March 1st, in the interests of the public and the court, it would be the latter's duty to consider such a question at any stage of the proceeding, however presented or suggested, and, if it is certain that only a moot question remains, to dismiss the suit in order to devote the time and effort which would be required for its consideration to other public business.

[2] While the allegations of the bill concerning the mayor's activities may have evidential value, merely as a circumstance bearing on, and to some extent explaining the action and attitude of the defendants, yet, upon the consideration of the present motion, and in view of the conclusion reached, no weight is to be attached to this averment. The city, in matters of this character, speaks and acts by ordinance. Section 18, art. 4, Seattle City Charter; Hotel Cecil Co. v. Seattle, 104 Wash. 460, 469, 177 Pac. 347.

Upon the motion to dismiss, defendants contend that there is an adequate remedy at law; that the questions involved have become moot because of the payment, March 1st, after the institution of this suit, of the interest then falling due. They further contend that no duty devolved upon the defendant city to set aside and create a calendar month prior to March 1st a special fund to meet such interest.

Logically, the last contention should be first considered, for, if defendants are right in that, it obviates any necessity for considering the other two questions.

[3] As a part of the contention upon this point, the court is asked to take notice of the entire Ordinance No. 39025 quoted in part by complainant in its complaint, and to take particular notice of that part of paragraph 5 of the ordinance preceding that above quoted. In view of this contention the portions of paragraph 5 material to be considered are:

"There shall be, and is, hereby created and established, a special fund to be called 'Municipal Street Railway Bond Fund, 1919.' THE CITY OF SEATTLE * * * DOES HEREBY IRREVOCABLY OBLIGATE AND BIND ITSELF TO PAY into such fund out of the gross revenues of such municipal street railway system, and all additions, betterments to, and extensions of, such system, at any time hereafter acquired, BEFORE each semiannual installment of interest falls due, a sum equal to such semiannual installment of interest upon all such bonds then outstanding and unpaid. * * * Such fund is to be drawn upon for the sole purpose of paying the principal and interest of such bonds from and after the date of such bonds and so long as obligations are outstanding against such fund. *The city treasurer of the city of Seattle shall, semiannually, one calendar month prior to the date upon which any interest, or principal and interest, shall become due, set aside and pay into such fund.* * * *"

Defendants' contention is that the only thing to which the city is bound by the foregoing is indicated by the capitalized portion of the above, and that the italicized portion of the above section, upon which complainant relies, is merely a directory provision inserted for the guidance of the city treasurer and is in no sense a contractual provi-

sion to be invoked for complainant's benefit and protection; that is, that the city is only obligated to pay from the gross earnings into the special fund an amount equal to the interest at any time before the same falls due.

This is not a reasonable interpretation of the ordinance. Under the circumstances, a substantial time "before" the interest due date must have been in contemplation, else of what advantage could the proviso be? The calendar month proviso further on in the ordinance is simply making the preceding more specific and prescribes how long before the due date the city was obligated to set aside this special fund. Such certainty would be, not only for the advantage of the complainant, but might save the city, itself, some embarrassment as this and longer periods of time prior to the due date might be contended for by various and changing bondholders.

The gross earnings produced from the property were mortgaged by this arrangement to secure, not only the payment, but the prompt payment of the bonds and interest and the city's right and power in handling and disposing of such earnings is limited in accordance with Ordinance No. 39025. It, certainly, is of advantage to the complainant to have the specific money set aside in the hands of a bonded officer, an individual trustee, or quasi trustee, a calendar month prior to the due date. Whether the advantage be great or small, it is only that which the city contracted to do. Holding the money in trust, it is bound to handle it in the manner agreed. Complainant, in selling its property, had a right to dictate such provisions for what it considered its protection, and whether fancied or real makes no difference.

Reaching this conclusion in the main disposes of defendants' other contentions.

[4] The defendant city, by asserting that it was right in refusing to set aside the special fund a calendar month prior to the due date, asserts, in effect, that it will do the like in the future as it sees fit.

The specific performance prayed is not only payment to complainant of money, but the providing, setting aside, preserving, and keeping intact of a specific fund from a general fund covered by complainant's equitable mortgage, securing and making more certain the prompt payments by so doing.

[5] Were it not for the city's contention that it has a right to disregard the calendar month requirement of section 5 of the ordinance, mandamus, under section 8008, it might plausibly be argued, provides an adequate remedy at law, where the money had not been paid into the special fund, although the city held the money in trust for complainant.

Not only because of the cloud upon the bonds and the funds, general and special, from the earnings of the property, but because of the uncertainty arising from this contention and because of the difficulty of measuring the damage arising from such a breach and the multiplicity of actions to be avoided by a suit for specific performance, it is clear that equity has jurisdiction to that end. Thompson v. Emmett Irr. Dist., 227 Fed. 560, 142 C. C. A. 192; Union Pac. Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564–600, 16 Sup. Ct. 1173, 41 L. Ed.

265; Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594, 32 L. Ed. 1005; Franklin Tel. Co. v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776; Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843; Vickrey v. City of Sioux City (C. C.) 104 Fed. 164; Board of Com'rs v. Tollman, 145 Fed. 753, 772, 76 C. C. A. 317.

The court's attention has been called to a number of cases which are clearly distinguishable from the present suit; the distinction being, in the main, that the present is not a suit to compel or have the court undertake the performance of any high act of sovereignty, as the assessment or collection of a tax, but, rather, the compelling of performance of a contract provision as to the disposing and handling of money already collected, or after the same has been collected, such money arising from a particular source, that is, from the earnings of complainant's former property. The following résumé of these cases will show this distinction:

In Walkley v. City of Muscatine, 6 Wall. 481, 18 L. Ed. 930, the court was asked to enjoin the levy of taxes for the payment of a judgment recovered. Mandamus was held to be the proper remedy. No question was there involved of preservation of security for the payment of a debt, or the creation of security for its payment, or the right to enforce any contract provision regarding the handling of a security.

The case of Heine v. Board of Levee Commissioners, 19 Wall. 655, 22 L. Ed. 223, was one where it was held that a judgment recovered upon bonds and a return of no property found was necessary to establish that plaintiff had a valid claim before mandamus would issue to compel the levy and collection of taxes.

The validity of the bonds of the issue now before this court has been established, at least as to the parties now in court, by the decision of the Supreme Court of the State of Washington above cited. The present is not a suit to compel the levy and collection of a tax, but rather one by the vendor of property to compel the vendee to preserve available, against the day of payment, security stipulated in the contract of sale and arising out of the earnings of the property sold, itself.

Thompson v. Allen County, 115 U. S. 550, 6 Sup. Ct. 140, 29 L. Ed. 472, was a case where, after judgment obtained on certain bonds and the failure of mandamus thereon because no one would qualify as tax collector of the county, the court held that it was not in the power of a court of chancery to create a tax collector. The court held:

"The inadequacy of the remedy at law, which sometimes justifies the interference of a court of equity, does not consist merely in its failure to produce the money, a misfortune often attendant upon all remedies, but that in its nature or character it is not fitted or adapted to the end in view; for, in this sense, the remedy at law is adequate, as much so, at least, as any remedy which chancery can give."

The effect of this is to hold that the law court which rendered the judgment was as well qualified to perform the necessary function as a court of equity; that the law court through its sheriff or marshal is as well qualified to collect the taxes as a receiver appointed by a court of chancery.

The case of Yost v. Dallas County, 236 U. S. 50, 35 Sup. Ct. 235, 59 L. Ed. 460, is one of the numerous railroad bond tax cases arising in Missouri, and the court therein reaches the same conclusion as that arrived at in the last case, but does so by a different route; instead of holding that a court of equity did not have such a power in any case, the court holds, in effect, that the machinery provided by the state for the collection of a tax to pay the bonds was a part of the contract, and that for the court to collect the taxes through its appointee would be to make a contract for the parties. That this is the effect of the decision is shown by the following from the syllabi:

"The right given in bonds issued by a county pursuant to legislative authority to have a tax levied, collected and applied to their payment, is to have such tax levied and collected in the manner provided by statute, and courts cannot substitute their own appointee in place of one contemplated by the act.

"Even where the state court by mandamus has directed the officers of a county to levy and collect a tax as required by the state statute and apply it to the payment of a judgment for defaulted bonds, and they have failed to do so, the federal court has not jurisdiction to appoint a commission to levy, collect and apply the tax.

"Until the highest court of Missouri otherwise construes Rev. Stat. § 11417, Missouri, giving the Circuit Court power to enforce by mandamus or otherwise an order of the county court to have a tax assessed, this court will not construe the words 'or otherwise' as authorizing the court to collect the tax itself, but as only allowing the resort to other means besides mandamus to compel the county court to do so."

Hennessy v. Woolworth, 128 U. S. 438 (9 Sup. Ct. 109, 32 L. Ed. 500), has no application, as shown by the following syllabus:

"In this case, it not being clearly established that the wife assented to the agreement for the sale of her real estate of which a specific performance is sought to be enforced, though the assent of the husband is shown, the decree is refused."

That Whitehead v. Shattuck, 138 U. S. 146 (11 Sup. Ct. 276, 34 L. Ed. 873), has no application is shown by the following syllabus:

"When the right set up by the plaintiff is a title to real estate, and the remedy sought is its possession and enjoyment, that remedy should be sought at law, where both parties have a constitutional right to call for a jury."

McCabe v. Matthews, 155 U. S. 550, 15 Sup. Ct. 190, 39 L. Ed. 253, has no application. That was a case which concerned a contract for the sale of an interest in real estate worth $300 when made, and where there had been a delay in asserting a right under the contract for nearly nine years after notice of repudiation of the contract by the defendant, during which time the property had increased in value to $15,000. Specific performance was refused on account of laches.

In Blue Point Oyster Co. v. Haagenson (D. C.) 209 Fed. 278, the contract of which specific performance was denied was to run over a period of 20 years and required, among other things, that the oysters sold should be of a certain quality and a certain quantity in each sack. To enforce specific performance of such a contract, the decree would require supervision by the court of such details in the operation of a business as it was unsuited to perform and which might be too burden-

some in its nature, and, for that reason, specific performance was denied.

Defendants mainly rely upon the decision of the Supreme Court in Raton Water Works Co. v. Raton, 174 U. S. 360 (19 Sup. Ct. 719, 43 L. Ed. 1005). The effect of this decision is fairly indicated by the syllabus, which is:

"The waterworks company contracted with the municipal corporation of Raton to construct and maintain waterworks for it, and the corporation contracted to pay an agreed rental for the use of hydrants for 25 years. The works were constructed, and the corporation issued to the company, in pursuance of ordinances, warrants for such payments falling due once in every six months. Subsequently the corporation repealed the ordinances authorizing payment of the warrants, and passed other ordinances in conflict with them, whereupon the corporation refused to pay the warrants which had accrued and others as they became due. Thereupon the company filed this bill to enforce the payments of the amounts of rental already accrued, and as it should become due thereafter. Held, that the remedy of the company upon the warrants was at law, and not in equity, and that the court below should have dismissed the bill, without prejudice to the right of the company to bring an action at law."

In that case the town had undertaken to avoid the whole 25-year contract. It was refusing, because of avoiding ordinances, to pay anything either for accrued rent or rent to accrue. In such a situation a remedy at law exists, but in the present suit the city is not refusing to pay. It has failed or refused to safeguard payment by creating a security for which it had contracted, at the time, and as promptly as it had contracted to create it, and by its contention that it was right in so refusing, or so doing, it justifies the conclusion that it will, as to future accruing payments, continue so to do as it sees fit.

In Buzard v. Houston, 119 U. S. 347, 7 Sup. Ct. 249, 30 L. Ed. 451, there was no question of the effect of defendant's action upon repeated and recurrent obligations to arise in the future. The court held that, where there had been misrepresentations in connection with the sale of chattels, the remedy at law for deceit was adequate; that—

"It is not in every case of fraud that relief is to be administered by a court of equity."

A part of the relief prayed in that case was the setting aside of an assignment and the reinstatement of the assigned contract with defendant, out of which plaintiff had been tricked and of which the court says:

"* * * If the exchange of the contracts was procured by the fraud alleged, it would be no more binding upon the plaintiffs at law than in equity; and in an action of deceit the plaintiffs might treat the assignment of the contract with Mosty as void, and, upon delivering up that contract to the defendant recover full damages for the non-performance of the original agreement." 119 U. S. at page 353, 7 Sup. Ct. at page 252, 50 L. Ed. 451.

In Cruickshank v. Bidwell, 176 U. S. 73, 20 Sup. Ct. 280, 44 L. Ed. 377, it was sought to restrain the collector of customs from refusing a tea importer possession of imported teas on the ground that the act of Congress purporting to give the collector authority so to do, when such tea did not measure up to a certain standard, was unconstitutional. It was said:

"The matter in dispute was averred to be 'the value of the said teas and the right to import teas.'" (176 U. S. at page 81, 20 Sup. Ct. at page 284, 44 L. Ed. 377)—as to teas already imported and held by the collector for destruction.

The court further said:

"Nor was there any averment of injury by reason of the condemnation of these teas other than the loss of the teas themselves."

The value of such teas was the measure of relief, and there was, of course, an adequate remedy at law to that extent.

As to contemplated future importations, the court said:

"The allegations in respect of apprehended deprivation of the right to import and deal in teas were that complainants intended to import from time to time other invoices of teas and that the collector threatened to take possession of and hold them in the exercise of authority under the act of Congress in the same manner as the particular teas in question. This was in effect to assert a vested right to import and deal in teas which might be impure and unwholesome, and which were at all events, inferior to the uniform standards 'of purity, quality and fitness for consumption' fixed by the Secretary. The law does not prohibit the importation of teas coming up to the standards, and it is difficult to perceive the elements of irreparable injury in the denial of permission to import inferior teas.

"Manifestly the seizure of importations of teas purchased after the approval of the act and the establishment of regulations and standards thereunder, publicly promulgated and known to complainants, because falling below the standards prescribed, *could inflict no other injury than what it must be assumed was anticipated,* and the interposition of a court of equity cannot properly be invoked, under such circumstances, to determine in advance whether complainants, if they imported teas of that character, could escape the consequences on the ground of the invalidity of the law." 176 U. S. at page 82, 20 Sup. Ct. at page 284, 44 L. Ed. 377. (Italics ours.)

The effect of this is that the right to import property to be purchased is not property, and, further, that it is not a vested right in property at the time of the enactment of the law, and that in so far as future purchases and importations are concerned, their rejection will be anticipated by the one contemplating purchase and the injury resulting may be either avoided by not purchasing or undertaking importations or else accepted and assumed. The court also held that the unconstitutionality of the law, alone, does not give a right to injunctive relief.

The motion to dismiss will be denied.