CASADY et al. v. FIRST STATE BANK OF CHEYENNE, OKL., et al.

No. 6058.

District Court, W. D. Oklahoma.

Sept. 29, 1938.

W. C. Austin, of Altus, Okl., for plaintiffs.

Everest, McKenzie & Gibbens, of Oklahoma City, Okl., for defendants.

VAUGHT, District Judge.

This is an action brought by John C. Casady, as treasurer of the town of Cheyenne, Oklahoma, and others, against the

First State Bank of Cheyenne, Oklahoma, and the Federal Deposit Insurance Corporation, and others, as defendants.

John C. Casady, at the time of the filing of this action, was the duly elected, qualified and acting treasurer of the town of Cheyenne, Oklahoma, and at the time of the failure of said bank, the town of Cheyenne had five separate deposits in said bank. The first is designated Cheyenne Sinking Fund, which deposit showed a balance of $11,752.04; the second, City of Cheyenne Meter Fund % John C. Casady, with a balance of $131; the third, Firemen's Pension Fund, John C. Casady, with a balance of $462.68; the fourth, City of Cheyenne Paving Fund, in which there was a balance of $1,801.06; and, the fifth, the Cheyenne General, with a balance of $156.43.

The plaintiffs contend that each of these constituted separate and distinct funds and while they were under the control of and the deposits were made by Casady, they were at all times kept separate and distinct; that, upon the failure of said bank, each of said deposits was secured in the amount of $5,000 by the defendant insurance corporation; that the said Federal Deposit Insurance Corporation is therefore liable on the first deposit in the amount of $5,000 and is liable for the full amount of each of the other deposits, and in their petition, pray judgment accordingly.

The answer of the Federal Deposit Insurance Corporation admits that said deposits were in the bank at the time of its failure, but contends that all of said deposits constituted one deposit and therefore, the extent of the insurance corporation's liability is $5,000 on the combined deposits.

There are other parties to this action but the one question for this court to determine is whether or not the town of Cheyenne had five deposits or one deposit.

The record in this case has had careful consideration. The original ledger sheets were introduced as evidence showing five distinct deposits, as enumerated hereinbefore, and showing the amount in each of the deposits as alleged by the plaintiffs.

The court is impressed with the careful reasoning in the defendant's brief, and *it is necessary* to determine the character of each of these deposits.

Section 12B, subsection (*l*) of the Federal Reserve Act of June 16, 1933, 48 Stat. 168, as amended by the Act of June 16, 1934, provides among other things:

"For the purposes of this subsection, the term 'insured deposit liability' shall mean with respect to the owner of any claim arising out of a deposit liability of such closed bank the following percentages of the net amount due to such owner by such closed bank on account of deposit liabilities. * * *"

Said subsection further provides:

"That, in determining the amount due to such owner for the purpose of fixing such percentage, there shall be added together *all net amounts due to such owner in the same capacity or the same right,* on account of deposits, regardless of whether such deposits be maintained in his name or in the names of others for his benefit." (Italics ours.)

What is meant by, "in the same capacity or the same right?"

Section 19, Article 10, of the Constitution of Oklahoma, Okl.St.Ann.Const. art. 10, § 19, provides:

"Every act enacted by the Legislature, and every ordinance and resolution passed by any county, city, town, or municipal board or local legislative body, levying a tax shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose."

Sections 26, 27 and 28 of Article 10 of the Constitution of Oklahoma, Okl.St.Ann. Const. art. 10, §§ 26–28, are as follows:

"§ 26. No county, city, town, township, school district, or other political corporation, or subdivision of the State, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters thereof, voting at an election, to be held for that purpose, nor in cases requiring such assent, shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum of the valuation of the taxable property therein, to be ascertained from the last assessment for State and county purposes previous to the incurring of such indebtedness: Provided, That any county, city, town, township, school district, or other political corporation, or subdivision of the State, incurring any indebtedness, requiring the assent of the voters as aforesaid, shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebt-

edness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty-five years from the time of contracting the same."

"§ 27. Any incorporated city or town in this State may, by a majority of the qualified property tax paying voters of such city or town, voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than that specified in section twenty-six, for the purpose of purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city: Provided, That any such city or town incurring any such indebtedness requiring the assent of the voters as aforesaid, shall have the power to provide for, and, before or at the time of incurring such indebtedness, shall provide for the collection of an annual tax in addition to the other taxes provided for by this Constitution, sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty-five years from the time of contracting the same."

"§ 28. Counties, townships, school districts, cities, and towns shall levy sufficient additional revenue to create a sinking fund to be used, first, for the payment of interest coupons as they fall due; second, for the payment of bonds as they fall due; third, for the payments of such parts of judgments as such municipality may, by law, be required to pay."

In St. Louis-San Francisco Ry. Co. v. Blake, 36 F.2d 652, the Circuit Court of Appeals, Tenth Circuit, had under consideration these specific sections of our Constitution, with reference to the right of bondholders in sinking funds and in that opinion, the court said [page 653]:

" * * * the city holds the legal title thereto in trust for such bondholders and judgment creditors."

This was an action brought by the railway company seeking to recover what the railway company termed illegal taxes, a portion of which had gone into the sinking fund, and the court further said:

"The treasurer is largely in the position of a stakeholder."

And, quoting from City of Anthony v. State, 49 Kan. 246, 30 P. 488, the court further held:

"The bondholders are the only persons who could be made real parties in interest as defendants in this controversy. They are the only ones whose rights will be substantially affected by declaring the bonds to be invalid or by enjoining the officers from levying or collecting any taxes to pay them or to pay any interest thereon."

The Fifth Circuit Court of Appeals in Hidalgo County Road Dist. No. 1 et al. v. Morey, 74 F.2d 101, said [page 104]:

"A fund created pursuant to statute to be used in paying the interest and principal of bonds issued by a public body is held in trust for the bondholders, and a court of equity has jurisdiction to protect and enforce the rights of the bondholders in or to such fund. City of Austin v. Cahill, 99 Tex. 172, 88 S.W. 542, 547, 89 S.W. 552; Maenhaut v. New Orleans, Fed.Cas.No. 8,-939, 2 Woods, 108. A court of equity properly may intervene and afford appropriate relief when it is made to appear that the rights of bondholders in such a trust fund are interfered with or threatened. Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U.S. 564, 600, 16 S.Ct. 1173, 41 L.Ed. 265; Puget Sound Power & Light Co. v. City of Seattle (D.C.) 271 F. 958, 964:"

The necessity for protecting a sinking fund as a trust fund is emphasized by the Supreme Court of Oklahoma in State ex rel. Hatfield v. Moreland, 152 Okl. 37, 3 P. 2d 803.

If, therefore, a sinking fund is a trust fund to which the city, in the case at Bar, has only the naked legal title but the equitable title is in the bondholders and if the Constitution and the state statutes so surround the handling of this sinking fund with limitations as to prescribe the only purposes for which it may be used, then it becomes a trust fund separate and distinct from any other funds that are handled by the city.

As to the general fund, which represents the city's one operating expense fund, a check can be drawn upon this fund by the treasurer only upon authorization of the city aunthorities. It must be appropriated and is wholly in the hands of the city to do with as the city may desire, limited, of course, only by the laws of the state. It is in no sense a trust fund. It is subject to the payment of the ordinary operating expenses of the city and is wholly in the hands of the city for disposition.

The paving account is also a separate and distinct account. It is not derived from general taxes but it is collected by the authorities from assessments made

against abutting property and is levied for the purpose of liquidating bonds which have been issued for the construction of said paving.

In Straughn v. Berry, 179 Okl. 364, 65 P.2d 1203, the Supreme Court of Oklahoma held, quoting from Brown-Crummer Inv. Co. v. City of Miami, D.C., 40 F.2d 508:

"The assessments and penalties collected by the city for the retirement of the bonds constitutes a trust fund, and may be used only for the particular purpose for which it was assessed and collected, and the city is without authority to divert the fund to any other use until all the bonds with accrued interest have been retired. Spitzer v. City of El Reno, 41 Okl. 430, 138 P. 797. The relationship between the city and the bondholder is that of an express trust created by law, in which the city is the trustee and the bondholder the cestui que trust. Peake v. City of New Orleans, 139 U.S. 342, 11 S.Ct. 541, 35 L.Ed. 131; City of New Orleans v. Warner, 175 U.S. 120, 20 S.Ct. 44, 44 L.Ed. 96." [page 1205.]

In Moore v. City of Nampa, 18 F.2d 860, the Ninth Circuit Court of Appeals held, quoting from syllabus:

"In collecting money to pay for special improvements, where there is no liability of the corporation, its officers do not act as its representatives, but as special agents or instrumentalities to accomplish a public end."

And in the body of the opinion, the court stated:

"And it is uniformly held that in collecting money to pay for special improvements, where there is no liability against the corporation, the corporation authorities do not act as its representatives, but as special agents or instrumentalities to accomplish a public end. Quill v. City of Indianapolis, 124 Ind. 292, 23 N.E. 788, 7 L.R.A. 681; Town of Capitol Heights v. Steiner, 211 Ala. 640, 101 So. 451, 38 A.L.R. 1264; City of Bainbridge v. Jester, 157 Ga. 505, 121 S.E. 798, 33 A.L.R. 1406; Town of Windfall City v. First Nat. Bank, 172 Ind. 679, 690, 87 N.E. 984, 89 N.E. 311; Beggs v. Kelly, 110 Okl. 274, 238 P. 466. * * *"

If the treasurer, therefore, is merely the agent of the bondholders, he certainly holds the funds collected for street paving in an entirely different capacity from that in which he holds the general funds of the city.

The next fund was known as the firemen's pension fund. The Oklahoma Legislature enacted a law in 1913 providing that the mayor or the president of the board of trustees, the clerk and the treasurer of every incorporated city or town in the state, together with two members from the fire department from such city or town should constitute a board of trustees of "The Firemen's Relief and Pension Fund" of the fire department of such incorporated city or town and the Act provides that treasurer of the town or city shall be the treasurer of this fund. It provided means of collecting the fund, including tax on insurance premiums, etc. Okl.Sess.Laws 1913, chap. 244, page 672, 11 Okl.St.Ann. §§ 361 to 381, inclusive.

This is wholly independent of the city government. The city, as such, certainly has no authority or control over these funds and the city treasurer, as such, would have no control over them. He is made an ex officio member of the board by such act of the Legislature and this fund is not only a trust fund but it is a sacred fund set apart for the benefit of the family of the deceased fireman and can only be used for the purposes specifically enumerated in the statute.

The fifth and last account or deposit is that designated as the meter deposit fund. This is a fund which is collected from the users of city water to guarantee the return of the meter which is installed for the benefit of each such user. The money is not subject to appropriation. It is held in trust and belongs to the property owner who secures the use of the meter and makes a deposit for its return. When the user ceases to use the meter and it is tendered back to the city, then the user is entitled to the return of his deposit. This fund is as wholly different from the general fund as the private assets of any city official would be from the assets of the city.

It is contended in the brief of the defendant that Congress never intended that these deposits should be treated as separate and distinct deposits and in order to show the intention of Congress, it sets out at length the testimony or statement of Mr. L. E. Birdzell, general counsel for the defendant, before the committee on Banking and Currency, House of Representatives, at the time this act was being considered

by Congress. An excerpt from the discussion is attached hereto and is made a part of this opinion.[1]

█ This court is clearly of the opinion that it was not the intention of Congress to provide that, as in the case at Bar, the

[1] Excerpt from: Hearing before the Committee on Banking and Currency, House of Representatives on H. R. 5357, Banking Act of 1935.

"Congressman Wolcott: With respect to public money, where a county or municipality determines on a particular bank as a depository for its funds, that is usually kept in a lump-sum deposit?

"Mr. Birdzell: Yes.

"Congressman Wolcott: However, on their own books, they carry it as grades, highways, sewers, contingent, and so forth. Would the municipality have this fund guaranteed as a lump sum, or would it be guaranteed according to the manner in which it was carried on the books?

"Mr. Birdzell: According to the manner they are owned. For instance, if a city carries its deposit in a bank, and it places its funds divided, we will say, for general fund purposes or for some specific purpose for which funds may be appropriated, so that it keeps its books separately, so that it can keep account of deposits withdrawn or deposited for particular purposes, nevertheless those are city funds and they must be combined for the purpose of insurance; but, on the other hand, school funds may be deposited by the same treasurer as deposits of city funds, and yet the schools, being a separate corporate entity, would separately own whatever funds were deposited and the school corporation could make a separate claim.

"Congressman Wolcott: Let us take, as an example, a county where they have a general fund, and then they have · a drainage fund, and they have a highway fund and a school fund, and then a fund into which go the collections made by the county treasury for the benefit of the townships, where the county treasurer acts on the matter of delinquent taxes as the agent of the township, your criterion is as to whether these funds are held to the credit of the distinct political subdivision and political entities of that county?

"Mr. Birdzell: Yes. It may be different in the case of your drainage funds that you speak of, or your—

"Congressman Wolcott: Irrigation district?

"Mr. Birdzell: Irrigation district, or something of that sort, where that is a special assessment district and as such would be the proceeds of special assessments levied. The same may be ·true· of your highways. In that case the drain-

age district or the highway district would be considered a separate political entity.

"Congressman Wolcott: Then in order to get the full advantage of this insurance, the municipal corporation or the State legislature should provide that the school district and the drainage district or irrigation district, sidewalk district, or highway district should be considered to all intents and purposes a political entity of the county?

"Mr. Birdzell: It would depend on whether or not they are in fact so. If they are, they are getting the benefit of insurance now.

"Congressman Wolcott: The average county or municipality makes a separate levy for school purposes. They make a separate levy for highway purposes and for all of these different purposes, and carry them separately on their tax rolls. Do you think that under that system they should be entities to the extent that each of these funds would be insured up to $5,000.00?

"Mr. Birdzell: It depends upon whether the proceeds of the city tax for school purposes belongs to the city, or whether they have a separate corporate organization. If it be a separate organization, and the tax was intended for that corporation, then that corporation would own the deposits.

"Congressman Wolcott: Of course, there is a great deal of overlapping there in their prerogatives, and the municipality or city or county always exercises a certain supervisory duty with respect to all of these other entities, and while specifically these funds belong to the district, at the same time they belong to the county and the county is made responsible for them.

"Mr. Birdzell: The county might be merely the agent for collecting the funds. That is true in many instances, and it might be that they would employ one common treasurer who would have the control of the deposits, but nevertheless the funds, when they go on deposit, are certainly going on deposit to the credit of the particular municipality that is authorized to expend them. That being the case, they would belong to that municipality and that municipality would be getting the benefit of the insurance.

"Congressman Wolcott: The criterion seems to be whether any part of this fund which is deposited by the county or city treasurer is intended to have been deposited in connection with the

sinking fund which belongs to the bond-holders and which is collected for their benefit, should be intermingled and become a part of the general fund of the municipality but that it should be treated as separate and distinct in all particulars. As stated above, the meter fund, the firemen's pension fund and other funds represented by these deposits are placed in the same class as the sinking fund referred to in the discussion before the committee, because the funds do not belong to the municipality and the municipality or the treasurer is merely the agent for purposes of collection and custody.

The court finds that each of said deposits constituted a separate and distinct deposit and that the defendant insurance corporation is liable on each of said deposits. That is, the extent of the liability of the defendant insurance corporation on the sinking fund deposit is $5,000. Each of the other deposits being less than $5,000, the court finds that the insurance corporation is liable for the full amount of each of said deposits.

Findings of fact and conclusions of law and a form of judgment, consistent with this opinion, may be submitted. An exception is allowed the defendant.

credit which he gives that entity on his own books?

"Mr. Birdzell: Yes; that is correct. We have even gone to the extent in some cases of giving assurance that sinking funds actually belong under the peculiar law that they be rated under to the holders of the bonds rather than to the municipality. There is one instance that we have come across where the ownership of the sinking funds is so definitely fixed by the State law under which they are collected that it can be said definitely that they belong to the owners of the bonds rather than to the municipality. It is a question of ownership in the last analysis."